### 1340.   HOLMES *v.* THE STATE.

1. Every person has the right to resist an illegal arrest, whether attempted by an officer or by a private individual, and, in resistance, may use as much force as is necessary for the purpose, and no more.
2. An officer has no right to proceed to the extremity of shooting one whom he is attempting to arrest for a violation of a municipal ordinance, in order to prevent his escape, even though the offender can not be taken otherwise.
3. If a person attempts to avoid an illegal arrest by flight, and is shot at by an officer who is attempting to make the illegal arrest, he may shoot the officer, if it reasonably appears to him that it is necessary to do so, either to prevent his illegal arrest, to save his life, or to protect himself from serious bodily injury.
4. A private citizen who joins in a felonious attempt by an officer to make an illegal arrest occupies no better position than the officer himself. If the party whom the officer was attempting illegally to arrest would have been justifiable in killing the officer, he would be also justifiable in killing a private citizen actually assisting the officer in the commission of the felonious act.

Conviction of manslaughter, from Bibb superior court—Judge Felton. July 14, 1908.

Submitted October 7,—Decided November 10, 1908.

*W. D. McNeil, J. E. Hall,* for plaintiff in error.

*William Brunson, solicitor-general,* contra.

HILL, C. J. Julius Holmes was indicted for murder and was convicted of voluntary manslaughter and sentenced to twenty years in the penitentiary. His motion for a new trial was overruled, and the case is here on review. The material facts are as follows: A negro woman made complaint at police headquarters in Macon

that Julius Holmes had cursed her, and she wanted him arrested for disorderly conduct. The day after this complaint was made, Rogers, a policeman, went to the house where Holmes and the woman both lived, for the purpose of arresting him as requested by her. He reached the house about dark and found Holmes in his room, cooking his supper. The officer notified Holmes that he "had come after him to arrest him." Holmes had a knife in his hand and a pistol on his bed. When the officer appeared in the room and told Holmes that he had come to arrest him, Holmes tried to get the pistol on the bed, but the officer got it first and put it in his pocket. Holmes went back in a corner of the room and said to the officer: "I will be God damned if I will be arrested." The officer replied: "There is no use of nothing like that. I have come for you and I am going to carry you if it takes the whole police force." And Holmes said: "You had just as well send for them; I will die before I will be arrested." The officer told the woman who had made the complaint the day before, and who was in the house, to telephone to headquarters for another policeman. Pending the arrival of this policeman, Rogers and Holmes stood in the room, talking. Rogers told Holmes that he had been making a disturbance there and the people wanted him arrested. Holmes asked Rogers "to give him a subpœna to come to court next day, and said he would come, but he would not be arrested." During this time Rogers was standing in the door, and Holmes made several attempts to get out by him, but the officer "pushed him back with his bare arm," not drawing his pistol. In about twenty minutes Jobson, the other policeman, who had been telephoned for, got to the house. The two officers went into Holmes' room, took hold of him, and "pulled him out of the room on to the ground." He struggled to get loose, declaring that "it would take the whole damned police force to carry him." He finally jerked loose and went back into the house. Jobson testified, that, while struggling to get loose from the officers, "he did not make any effort to cut either of us. He could have cut us when he jerked loose." This officer also testified: "He was in his room about a minute, and I ran up to the door to push it open. When he opened the door, I was away from the steps, about four steps, I think. He stepped on the first step and jumped off and turned the corner of the house. He had a double-barrel shotgun by the

stock and barrel. I did not shoot until he wheeled and pointed it at me about half way from the corner of the house to the front fence. I fired twice at him in the yard. I shot in all five times." Rogers, the other officer,. testified: "We were standing in front of the door when Julius came out again. We got to the end of the house where he came by. Mr. Jobson fired the first shot when Julius was nearly to the other end of the house. He had already passed him, Jobson, and was running away from us. He turned around to shoot Jobson with the shotgun. He was passing Jobson when he threw the gun up. Then he started down the alley." Both officers pursued the negro, and were joined in the pursuit by Mr. Wimberly, the deceased. Wimberly was ahead of Jobson, and Jobson "holloaed at him not to run up on him, he had a double-barrelled shotgun. And about that time he wheeled and fired. Mr. Wimberly was about 25 feet behind him, and I was about 60 feet behind Wimberly. He shot one time, and Mr. Wimberly fell. I don't know why Mr. Wimberly joined the chase after the negro, but he was right behind him and was running. The defendant was also running." Lucy Cole, the woman who had made the complaint the day before against Holmes, testified that she did not swear out any warrant, but reported him to police headquarters the night before the shooting, because "he cursed me and raised a disturbance in his room, cursing me through the partition between our rooms." She also testified, that when the officers were struggling with the negro, in the yard, they both had their pistols, and he had his knife in his hand, but made no effort to use it; that the negro ran out of the house and the officers ran after him. The crowd "holloaed 'get him,' 'shoot him,' " before Wimberly was shot. The defendant introduced no evidence. His statement in no wise affects or illustrates the conclusion we have reached from a consideration of the evidence for the State.

1. We do not see how the verdict in this case can be sustained by any theory of the law, under the facts shown by the State. It is true that the general rule is that it is manslaughter to kill an officer or other person to prevent an illegal arrest. *Jenkins* v. *State,* 3 *Ga. App.* 146 (59 S. E. 435); *Thomas* v. *State,* 91 *Ga.* 206 (18 S. E. 305). But this general rule is subject to exceptions. Two may be mentioned: First, when the person who kills in resisting the illegal arrest uses no more force than is necessary;

and second, when the officer or other person making the illegal arrest uses more force than is necessary to overcome the resistance, and puts the person to be arrested in fear of his life or of great bodily harm. Here, under the admitted facts, the arrest, or attempted arrest, was illegal. There was no warrant. The defendant was not "wanted for a State offense, felony or misdemeanor." The offense for which he was wanted was a trivial violation of a municipal ordinance. This trivial offense was not committed in the presence of the arresting officers, but, the day before, a complaint was made by the negro woman that the defendant had cursed her "through the partition between their rooms." If this information was sufficient on which to base an arrest, it was sufficient on which to base a warrant. There was no want of time or opportunity for either the complaining woman or the arresting officers to procure a warrant. The defendant was not endeavoring to escape to avoid an arrest, and there was no pressing emergency for his arrest. There seems to have been absolutely no reason for not having procured a warrant, and for attempting an arrest without one. A policeman, under these circumstances, can not be allowed to dispense with a warrant when making or attempting an arrest, any more than any other officer of the law. When the policemen went into the defendant's house to arrest him without a warrant, they were trespassers in a double sense—trespassers upon the sacred right of personal liberty, and trespassers upon the right of domicile. The defendant had a legal right to resist both trespassers, and to use in resistance as much force as was necessary to make resistance effective.

2. When the officers, attempting to make the illegal arrest of the defendant, forcibly pulled him from his house, and endeavored to handcuff him, they were guilty of an assault and battery. The defendant, thus wrongfully and illegally deprived of his liberty, had the right to regain it and to use all force necessary for that purpose. If he succeeded in jerking loose from the officers, ran into his house, got his gun, and attempted to escape, the officers had no right to shoot him to prevent his escape. In the language of Chief Justice Bleckley, "Every man, however guilty, has a right to shun an illegal arrest by flight." *Thomas* v. *State,* supra. If, in fleeing to prevent such illegal arrest, he is pursued and shot down by an officer who is attempting to make the illegal arrest,

such killing would be felonious. Even with a warrant, an officer can not legally kill one who flees from him to avoid an arrest for a misdemeanor. *Croom* v. *State,* 85 *Ga.* 725 (11 ·S. E. 1035, 21 Am. St. R. 179). The law values human life too highly to give an officer the right to proceed to the extremity of shooting one whom he is attempting to arrest for a violation of a municipal ordinance, in order to prevent his escape, even though the offender can not be taken otherwise. *Miers* v. *State,* 34 *Tex. Crim. R.* 161 (29 S. E. 1074, 53 Am. St. R. 705).

3, 4. The officer who shot at the defendant five times and hit him twice testified, that as the defendant jumped out of the door and turned the corner of the house, he called upon him to stop, and the defendant wheeled to shoot, and "I shot him." If this was true, we are not prepared to say that it would furnish any justification for this one shot by the officer attempting to make the illegal arrest. It certainly could furnish no excuse or justification for the four other shots fired at the negro when he was fleeing from the officers for his liberty and apparently for his life. But, according to the testimony of the other officer, when this first shot was fired at the defendant, "he was running away from us." Now, the undisputed evidence is, that the defendant, while fleeing from the officers to avoid an illegal arrest, was shot at by one of the officers four times; that he was hit twice, the bullet in each case going clear through his arm, and one of them penetrating his side. The positive evidence for the State, in addition to this undisputed evidence, is that the crowd cried, "Get him," "shoot him." If, under these circumstances, the fleeing negro turned and shot back at his pursuers, can it be doubted that the facts were sufficient to justify the fears of a reasonable man that his life was in danger, or that he was threatened with serious bodily injury? If, acting under these fears, he shot at his pursuers and killed, not one of the officers, but one who had joined the officers in their felonious pursuit, can it be doubted that the killing was justifiable homicide? Certainly, if the defendant had shot and killed the officer who was pursuing and shooting him, under the circumstances of this case, he would have been entirely justifiable. How could he be less justifiable because he shot and killed a private citizen who was more eager in the pursuit than the officer him-

self? For this officer declares that the deceased ran ahead of him after the negro.

The principles of law which we have announced in the foregoing opinion are not new. They come down to us from the common law. They are well settled both by the statutes and the decisions of the Supreme Court of this State. The learned judge in the trial court gave these principles to the jury, in an able and lucid charge; but, after a most careful consideration of the evidence as presented by the State, we are forced to the conclusion that the jury misapplied this law to the facts, and that the verdict is wholly unsupported by any evidence. This court fully understands and appreciates the delicate, difficult, and sometimes dangerous duties which police officers are called upon to perform, and it will uphold and protect them in the legal discharge of all their duties. But to approve the verdict in this case would be, in our opinion, a violation of the sacred right of personal liberty and a disregard of the right of self-defense, which the law guarantees to every citizen, whatever his color or condition.

The other assignments of error made in the record we do not consider it necessary to decide.      *Judgment reversed.*