## 1667. PERDUE v. THE STATE.

1. A citizen whom it is attempted unlawfully to arrest has a right to resist force with force proportionate to that being used to arrest him; and if, in the exercise of such right of resistance, he kills an officer who is unlawfully attempting to arrest him, he is guilty of no offense.

2. Where a person was on trial for murder in killing an officer, and his defense was that he killed the officer while he was attempting in a felonious manner to arrest him without authority, it was material and prejudicial error for the court to charge the jury, without qualification, as follows: "A party has no right to kill an officer even to prevent an illegal arrest; he has no right to kill him to prevent a legal or illegal arrest." Such instruction excluded the right to kill an officer to prevent an illegal arrest under any circumstances of felonious aggression on the part of the officer.

3. Where, in a trial for murder, the defense relied upon was lawful resistance to a felonious attempt to arrest without authority, the law of justifiable homicide in self-defense was not alone applicable. The court should have charged the jury also the law relating to the right of the defendant to resist an attempt to arrest him illegally.

4. None of the other assignments of error are meritorious.

Conviction of manslaughter, from Pike superior court—Judge Reagan. December 31, 1908.

Argued February 23,—Decided March 16, 1909.

*A. A. Murphey, E. F. Dupree, R. L. Berner, W. Y. Allen, E. M. Owen, John R. Cooper,* for plaintiff in error. *J. W. Wise,* solicitor-general, *O. H. B. Bloodworth, J. Y. Allen,* contra.

HILL, C. J. Ben Perdue was indicted for murder and convicted of voluntary manslaughter. The writ of error challenges the judgment overruling his motion for a new trial. The motion contains numerous grounds, but we shall consider only those which are deemed material. To a clear understanding of the decision arrived at, it is necessary to make a brief statement of the evidence in behalf of the State and that in behalf of the defendant. On the night of the killing, Ben Perdue, with several others, was on the streets of Barnesville, and was arrested by Ben Porch, the deceased, who was one of the policemen of the town. He was arrested for being drunk on the streets. The policeman took him to the town prison and incarcerated him for ten or fifteen minutes, and then released him from custody, on a cash deposit of $10 as security for his appearance to answer the charge for which he was arrested. About three o'clock in the morning, while Ben Porch was still on duty as a policeman, his attention was attracted by some one standing in Market street. He had a lantern in his hand, and, raising it, asked who it was, and the defendant replied, "I am Ben Perdue, and I have got you," and immediately shot him twice with a shotgun, loaded with number six or seven shot.

One load entered the right thigh on the outside, and some of the shot from this load entered the inside of the left thigh. The second shot entered the back. This statement of what occurred between the defendant and the deceased at the time of the shooting is the account given by the deceased soon after the shooting, and subsequently repeated by him in what was alleged to have been a dying declaration. The State also proved that after the defendant had been first arrested by the deceased, he left town, went to his home, secured a shotgun, and returned to town, with the declaration that he intended to kill the deceased. The State also proved that prior to this time there was "bad blood" between them, and that the defendant had on previous occasions threatened to kill the deceased. The deceased, in his statement of what occurred between them at the time of the shooting, further said, that the shooting by the defendant was entirely unprovoked, as he made no threats to arrest him or hostile demonstration of any character, but that immediately following his query as to who it was, the defendant shot him; that when he was shot the first time, he threw his hands around to draw his pistol from its scabbard, and the second shot was fired by the defendant before he had succeeded in drawing his pistol. This is a substantial statement of the material facts shown by the State, and, if true, makes a clear case of murder.

The defendant contended, that at the time of the shooting the deceased was endeavoring to arrest him illegally, and, to accomplish his illegal arrest, was making a felonious assault upon his person with a pistol, and that he shot the deceased under the fears of a reasonable man that a serious personal injury was about to be inflicted on him in this felonious attempt to illegally arrest him. In proof of this defense he introduced evidence tending to show, that the deceased entertained ill will towards him; that his arrest that night by the deceased was wholly without cause, as he was not drinking or under the influence of intoxicants; and that when the shooting took place he was quietly sitting in the foot of his buggy, preparing to go home, and was then waiting for a companion who was to go with him. In his statement to the jury, the defendant said: "While sitting there Mr. Porch came along. I saw him before he got to me. He was coming down Market street, coming I suppose from the depot. He came up the street. I was in hopes

he would go by and not see me. He did pass. He got ten steps or more by before he noticed me. The horse might have moved and attracted his attention. He turned and raised his lantern. He asked who it was. I told him Ben Perdue. I had raised up out of the foot of my buggy when he first spoke. He said, 'I thought you had gone home.' I said, 'I am going, I am fixing to go now.' He said, 'You are not doing any such thing.' I said, 'Yes, I am only waiting for Martin, and will leave in a few minutes.' Mr. Porch said, 'I am going to lock you up again.' I said, 'No, I am not doing anything to be locked up for.' Mr. Porch pulled off his glove, set his lantern down, and said, 'I will lock you up or kill you.' He reached his hand here (indicating) and pulled his pistol out this way, and stepped with one foot off the sidewalk towards me, and I shot him as he reached his pistol and pulled it that way. I shot Porch in the leg to stop him. I could have shot him in the face or stomach and have killed him when he passed, if I had wanted to have killed him. I did not want a difficulty with him. It was not my intention · to kill him, though he started to pull his gun to kill me. I shot him so he could not get to me or shoot me." This statement of the occurrence is substantially corroborated by the testimony of another person. The defendant explained, by the testimony of four witnesses, his innocent possession of the shotgun.

It is manifest, from the verdict of the jury, that they did not believe the evidence in behalf of the State; and it is apparent, from the verdict, that they did believe the defendant's statement and the evidence in his behalf. The verdict was as favorable to the defendant as the jury were authorized to find, under the instructions by the court as to the law applicable to the defense relied upon. The court charged the jury, in substance, that if the defendant shot the deceased because of his arrest, and that arrest was legal, he would be guilty of murder; that if he shot the deceased because of such arrest and that arrest was illegal, he would be guilty of murder or voluntary manslaughter, according to whether or not a sufficient time had elapsed, in the opinion of the jury, for passion to subside and reason to resume its sway; in other words, that although the defendant had been arrested without cause and illegally, yet if sufficient cooling time had elapsed between the illegal arrest and the killing, and the defendant killed

the deceased because of such illegal arrest, his offense would be murder; but that if, in the opinion of the jury, sufficient cooling time had not elapsed between the illegal arrest and the shooting, the defendant would be guilty of voluntary manslaughter. This part of the charge is objected to for various reasons by the defendant, but we think it clearly and aptly states the law applicable to the hypotheses.

It is contended by the defendant that the court, in charging the jury the law relating to the theory of the defense, eliminated the right of the defendant to protect himself from an illegal arrest, although such arrest may have been attempted in a violent and felonious manner; and that the court presented to the jury only the law of justifiable homicide in self-defense as laid down in §§70 and 71 of the Penal Code. Error is assigned on the following excerpt taken from the charge: "An arrest by an officer without a warrant where no offense has been committed in his presence would be illegal and unlawful, but I charge you that a party has no right to kill an officer even to prevent an illegal arrest. He has no right to kill to prevent either a legal or an illegal arrest." The errors alleged to exist in this instruction are elaborated with specific detail. The charge is alleged to be an incorrect statement of the law, because, as a matter of law, a person has a right to resist his illegal arrest, where it is attempted by force, and to use, in resistance, force commensurate with the force used against him to accomplish the illegal arrest. The charge in question, in substance, instructed the jury that a person could not, under any circumstances, kill an officer who was attempting to unlawfully arrest him. We think the exceptions made to this charge are well taken. While generally it is manslaughter to kill an officer to prevent an illegal arrest, yet there are exceptions to this general rule of law. Sometimes and under some circumstances a person has a right, in resisting an illegal arrest, to kill the officer who is attempting it. Whether the person whose right to liberty and freedom from illegal arrest, when these rights are unlawfully invaded, is guilty of any offense when he kills the aggressor depends upon the facts. As is said by this court in *Jenkins* v. *State*, 3 *Ga. App.* 146 (59 S. E. 435), " If the force of resistance is not in excess of the force of invasion, and is used solely for the purpose of prevention, no

offense is committed." This principle, is reaffirmed in *Holmes* v. *State,* ante, 166 (62 S. E. 716), in the following language: "Every person has the right to resist an illegal arrest, whether attempted by an officer or by a private individual, and, in resistance, may use as much force as is necessary for the purpose, and no more." The Supreme Court, in *Coleman* v. *State, 121 Ga.* 595 (49 S. E. 716), announces the same principle, as follows: "A citizen being unlawfully arrested has a right to resist force with force proportioned to that being used in detaining him." This case was where an officer was on trial for killing the person he was illegally attempting to arrest, and the Supreme Court, in declaring the law relating to his right, says, that, treating the arrest as having been màde without warrant of law, the case is to be governed by the law applicable to assault culminating in a homicide by the original wrong-doer; and, so treating it, if the defendant began the unlawful arrest with an intent to kill, if necessary, to make it effective, and, by a show of a deadly weapon, put the deceased in fear of his life, and the latter thereupon drew and fired, the defendant, having provoked and created a necessity, could not meet the same, but would be guilty of murder, if, under such circumstances, he took the life of the party *legally resisting the illegal arrest.* In the opinion the court further says: "If Griffin [the citizen whom the officer killed in attempting to illegally arrest him] met an unlawful assault with force proportioned to the attack, he was in the right." In *Porter* v. *State, 124 Ga.* 305 (52 S. E. 283, 2 L. R. A. (N. S.) 730), reasserting the same principle of the right to resist an illegal arrest, it is held, that one who is accused of a misdemeanor or of a violation of a city ordinance "may use proportionate force in resistance to an illegal arrest," and if the means employed to prevent his detention are not disproportionate to the effort to take him into custody, such proportionate resistance is lawful; and that only in a case where the force of resistance is in excess of and disproportioned to the force used in the attempted illegal arrest would the party who kills to avoid the arrest be guilty of voluntary manslaughter. In so far as this State is concerned, we think these decisions establish the right of one whom an officer is attempting to illegally arrest, to repel force with force, and to use such force as is necessary to make his resistance effectual. It

is the duty of a citizen to submit to a lawful arrest. It is not his duty to submit to an unlawful arrest. It is only when an officer of the law is acting under the authority of the law that he is entitled to the peaceful submission of the citizen. When he abuses his authority and transcends the bounds thereof, the citizen is not required to peacefully submit. " The citizen has the right to maintain his liberty at all hazards, against any and all persons who attempt to invade it unlawfully, taking care not rashly to use or resort to greater violence than is necessary to its protection." Ross v. State 10 Tex. App. 455 (38 Am. R. 643). The Supreme Court of the United States, on the question we are now considering, held the following to be the law: "If the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." Elk v. U. S., 177 U. S. 535 (20 Sup. Ct. 729, 44 L. ed. 874). This was also the principle declared in 1 East, P. C. c. 5, p. 328. In many cases collated by the learned editor in his note to Keady v. People, 32 Colo. 57 (74 Pac. 893, 66 L. R. A. 375), it is held, without qualification, that a person may resist an unlawful attempt to arrest him, and, if necessary, rather than submit, he may lawfully kill the person making the attempt; and Wharton, in his work on Homicide, declares: "If an officer, without legal authority or just cause, arrests a person, there is an illegal assault which such person has a right at once to resist and prevent; and if the death of the person seeking to make the arrest results from a resistance by lawful measures, it is excusable homicide." Whar. Hom. (3d ed.) §408. Or, as the same author expresses it in his treatise on Criminal Law, "Where A. unlawfully attempts to arrest B., B. is justified in resisting; and if A. so presses B. as to make it necessary for him to choose between submission and killing A., then the killing A. is not even manslaughter." 1 Whar. Cr. L. (8th ed.) § 414. Even under despotic Rome, where personal liberty was not held as sacred as in England and this country, if the officer acted without authority, the terse command to the assaulted citizen was, "Vim vi repellere licet."

We do not think that a person would have a right to kill an officer who attempted to commit a trespass upon his person and nothing more; the degree of force used to resist an illegal arrest

would depend upon that used or attempted by the officer; and where a person resists an officer attempting to arrest him without legal authority, and the resistance is only proportionate to the assault, and is provoked by it, and the killing is without malice, it is neither murder nor manslaughter. As before stated, we think that the charge of the court on this subject practically instructed the jury that under no circumstances would a party be justifiable in killing an officer to prevent an illegal arrest. This statement, without the modification suggested in this opinion, is too restrictive of the right of resistance under circumstances of felonious aggression by the officer; and this modification or qualification is nowhere made in the charge. On the contrary, the court subsequently repeats and emphasizes the declaration on this subject, in substantially the same language, and explicitly restricts the defense to the law of justifiable homicide in self-defense, as laid down in sections 70 and 71 of the Penal Code. In *Jenkins* v. *State,* supra, this court held: "Where the defense set up was lawful resistance to an illegal arrest, the law of self-defense was not alone applicable. The court should have instructed the jury as to the right of the defendant to resist an attempt to arrest him illegally, and not merely his right to defend himself against an attempt, by violence or surprise, to commit a felony on his person." This error of the charge is therefore material and prejudicial; and for this reason alone we think the plaintiff in error is entitled to another trial.

*Judgment reversed.*

POWELL, J., dissenting. In addition to giving in charge to the jury the general code sections on self-defense, the trial judge also charged the jury concretely as follows: "Gentlemen, if you should believe from the evidence that at the time the shooting occurred the deceased made threats to lock up defendant or kill him, at the same time pulling his pistol and pointing it at the defendant, and if you should believe that the circumstances were sufficient at the time to excite the fears of a reasonable man, and that the defendant really acted under the influence of those fears, and not in a spirit of revenge, when he shot at the deceased, then you should find the defendant not guilty." This presented the contention of the defendant in almost the exact words in which he in his statement had presented it. I think

this answers every reason stated in the majority opinion for the grant of a new trial.

There is no need to make confusion where simplicity normally exists, by attempting to lay down a different rule of justification through self-defense, where the deceased, though an officer, at-- tempts an arrest without authority, from that rule which would obtain if the deceased were a private citizen. The fact that the deceased was an officer and that the killing occurred pending an arrest becomes relevant merely for the purpose of determining whether the arrest was an assault and a trespass, or was a lawful act. Every arrest is in a sense an assault, but the officer is to be regarded as justified in the assault if his official capacity and his authority to make the arrest appear. Similarly, if a defend- ant has killed a private citizen who has made an assault upon him, it would be clearly pertinent to show that the private citizen was justified in the assault, for some reason known to the law.

An officer attempting to make an arrest without a warrant or other lawful authority stands on exactly the same footing as a private citizen would stand. The fact that the citizen is an offi- cer certainly does not enlarge the defendant's right to kill, even if the officer is attempting to do him some wrong. If the wrong attempted by the officer is a serious personal injury not amounting to a felony, but sufficient to arouse passion (and an unlawful arrest is ordinarily placed in this category), and the slayer kills on account of that wrong, it is voluntary manslaughter, just as it would be if the officer were a private citizen and had attempted the same wrong. If the wrong attempted by the officer amounts to a felony,—for example, if he attempts to arrest a defendant by shooting or by clubbing him with a stick likely to produce death, in a manner likely to produce death,—the slayer may kill in defense of a real or apparent danger emanating from this source, just as he might if the same wrongful act were attempted by a pri- vate citizen. An unlawful arrest, in an accurate sense of the term, whether committed by an officer or by a private citizen, being a mere misdemeanor, is never alone sufficient to justify a homicide, though it may be sufficient to reduce it from murder to manslaughter. If the unlawful arrest or the attempt to make an unlawful arrest is accompanied by such violence or show of violence as to put the defendant in actual danger or reasonable.

fear that a felony is about to be committed on him, it is not the unlawful arrest, but the danger, or the reasonable fear of the danger, that justifies.

It can not be that there is anything either in law or in intrinsic justice which would authorize a person to. slay an officer for an act which would not justify the killing if the latter were merely a private citizen. If the officer attempting to make the arrest really believes that he has authority to do so, and it is only upon a critical comparison of the transaction with the law that the illegality of the arrest appears, surely there is nothing in the bona fide mistake of the officer which exaggerates or enhances his assault and trespass upon the person of the slayer, beyond what it would be if the officer were merely a private citizen committing a similar trespass and assault. If the officer, in bad faith, knowing that he has no authority to make the arrest, nevertheless attempts it, he has then done no more to afford the slayer justification than a private citizen would have done who had offered him the same injury.

I do not understand there is anything in the cases of *Holmes* v. *State,* ante, 166 (62 S. E. 716), or in *Jenkins* v. *State, 3 Ga. App.* 146 (59 S. E. 435), which in any wise militates against this position; especially when the opinions in those cases are read in connection with the particular facts involved in the respective cases. I think the court presented the defendant's defense with sufficient fullness and fairness, and that a new trial should not be granted.