## 1946. DORSEY *v.* THE STATE.

1. The evidence in behalf of the State itself showing that the defendant was justifiable in resisting the attack of three persons engaged in attempting to arrest him without a warrant, and there being no evidence introduced in behalf of the State authorizing his arrest without a warrant, and it further appearing, from the evidence, that the nature of the attack upon him was such as would have justified his use of a knife in self-defense, the conviction was unauthorized.

2. Judicial cognizance does not extend to the contents of municipal ordinances; and the fact that a designated act may be disorderly conduct within the purview of a municipal ordinance, and an offense against the municipality, must be established by proper proof of the existence of an ordinance upon that subject.

Indictment for stabbing; from Morgan superior court—Judge Lewis. May 10, 1909.

Argued June 22, 1909.—Decided February 10, 1910.

*Percy Middlebrooks,* for plaintiff in error.

*Joseph E. Pottle, solicitor-general,* contra.

RUSSELL, J. The defendant was indicted for the offense of assault with intent to murder, and upon his trial was found guilty of stabbing. A motion for new trial, based wholly upon the general grounds, was overruled; and exception was taken.

1. The charge of the learned trial judge is unexceptionable. It is a remarkably full and lucid exposition of every principle of law involved in the case. Therefore, it can not be said that the verdict is contrary to law because superinduced by any error of the judge in his instructions. It appears from the record that there was some objection to a portion of the testimony which the court permitted to be submitted, but those objections, even if well taken, are not properly presented for our consideration. But though the trial was free from any error which could have affected the jury, we think that the judge erred in overruling the motion for new trial; because there is absolutely no evidence in the record which would authorize the conviction of the defendant of assault with intent to murder, stabbing, or even of a mere assault. We fully recognize the rule which gives the jury the exclusive right to determine the credibility of the witnesses, and have no desire whatever to interfere with their exclusive prerogative in selecting even a single fact or circumstance in proof before them as the basis for their finding, even though in doing so they may disregard, as not equally credible, or as of less weight, the positive testimony of a number of witnesses to the contrary. We have several times decided that in the case of a mere conflict in the testimony, the verdict should stand if there is any evidence to support the finding. In such a case the jury's prerogative of selection is paramount and exclusive. But a verdict rendered without any evidence to support it is for that reason contrary to law. The action of the jury in such a case is not a selection, but the *creation* of a hypothesis not supported by the proved facts. To support the verdict it is proper to indulge the presumption that every fact and circumstance tending to show the guilt of this defendant was preferred by the jury, rather than that any fact or circumstance tending to mitigate his offense or justify him was believed by them. In other words, if there was anything in the record of the evidence which would authorize the verdict rendered, this court could not interfere.

After a careful consideration of the testimony in behalf of the State (and excluding all testimony in behalf of the defendant, as discredited by the jury), we are convinced that the finding reached was not the proper legal result of the trial. While there are minor differences between the witnesses for the State as to immaterial incidents which transpired in the course of the difficulty, all of the witnesses agree that the defendant was seized while standing quietly in a store in the town of Buckhead, by three men, who, according to their own statements, sought to arrest him without a warrant, for some offense, the nature of which they refused to disclose to him. It is true that two of these three persons were officers, one the marshal and the other the assistant marshal of the town of Buckhead; and there is testimony that the third person had been deputized to assist the officers. But the offense, if any, was not committed in the presence of any of these persons. The defendant was not trying to escape, nor does it appear that there was any likelihood that there would be a failure of justice if the arrest had been delayed until a warrant could be issued. The arrest was requested by another negro, who had some words with the defendant, but even this was not in the presence of any of the arresting party. The conduct of the defendant in connection with the negro who made complaint to the town marshal was not in violation of any State law, and if the boisterous language used by him in the presence of the deputy marshal upon the railroad track, some time prior to the attempted arrest, was in violation of any municipal ordinance of the town of Buckhead, no such ordinance was introduced in evidence. Upon the railroad the defendant did not use any opprobrious language to or of the deputy marshal, though he stated that if Chivers (the marshal) put his hand on him he would kill him. If the defendant had used opprobrious language of or to either Wright (the deputy marshal) or Wagnon on the railroad, and they had been merely private individuals, either would have had the right, as a private individual, to resent it appropriately, if he did so immediately, but even this right would cease when the occasion ended. Nothing is better settled than that a battery can not be justified when the opprobrious words by which it is sought to justify the battery were used at a different time and place; and this even though the intervening time or space be but

small. The provocation which will thus justify a battery must be immediate,—on the spot.

Although Wagnon had not at that time been summoned as a member of the posse, still if we treat him as an officer, and hold that Wright and Wagnon might have arrested the defendant on the railroad for the offense of using profane language in the presence of a female, in that he told the negro woman to whom he was talking that he was "not going a damned step," the uncontradicted evidence shows that they were not seeking to arrest the defendant for that transaction.    According to the testimony of the chief marshal, Mr. Chivers, the defendant was arrested on the complaint of George Bell.    He does not dispute that he told Ryland Taylor a few minutes before the arrest that George Bell wanted him to arrest the defendant.    He was looking for the defendant at the time, and it was almost immediately before he found him and before the difficulty ensued.    Mr. Chivers says, "I went to supper, and when I came back from supper a negro came to me, and he told me Terrell Dorsey had raised a fuss with him and he wanted a case made against him, and I went to work to get Mr. Wagnon and Mr. Wright to assist me, and we found Terrell Dorsey in Mr. McWhorter's store, and Mr. Wright and myself walked in together, and I went up to Terrell and told him I would have to put him under arrest.    He asked me, for·what?    I told him it didn't matter about that, that I would tell him what the trouble was later on.    And I got hold of his right arm, and I said to Mr. Wright to get hold of his other arm.    And when I said that, he shoved me through a glass show-case, and I struck him with my billie.    And about that time Mr. Wagnon was there and had his gun out and I asked him to shoot him.    Anyway, we had a right smart scuffle and fighting, and got outside on the sidewalk, and there was a shot fired outside.    When that shot was fired, that negro Terrell Dorsey broke loose from the crowd."    On cross-examination the marshal testified, that the defendant was not doing anything when they went into McWhorter's store to arrest him, and that he had not seen him do anything himself, and that he went to arrest him because a negro named George Bell had made a case against him for a matter which occurred twenty minutes or half an hour before they went to arrest him.    He testified that the negro cut him twice behind the ear after he had hit him over the head with his

billie as hard as he could and staggered him, but that the negro did not have any knife out when he went into the store to arrest him; and there is no evidence that the defendant was attempting to use either knife or pistol, until after he had been assaulted by Chivers and Wright, and until after Wagnon, who had his pistol in his hand, had been directed to shoot him.    Mr. Wright testified: "When we went into the store there was nothing about shooting mentioned.    I didn't have any warrant for this negro.    Taylor told me he wanted him put up.    I caught hold of his left arm and Chivers his right.    He said, 'What do you want with me?' Chivers said, 'Consider yourself under arrest.'    Then the negro shook Chivers aloose.    He fell through the show-case when the negro threw him through it.    I had my hands full right then.    Chivers got hold of him as quick as he could.    .    .    He hit him again with the billy when he got out of the show-case, and the negro had me and Wagnon both, going with us both to the door.    He cut me on the face with a knife in the scuffle out of doors."    In regard to the shooting of the defendant, Mr. Wright testified he "only had a little 32," and was unable to state how many times he shot the defendant, but that he tried to shoot him all he could, and if he had a gun the defendant "wouldn't be here now."    Mr. Wagnon testified that he was cut on the ear by the defendant.    According to his testimony he went into the store, with Mr. Chivers and Mr. Wright immediately ahead him, and Mr. Chivers said, "Terrell, I want you," and Terrell said, "What for?" Chivers then took hold of the defendant, who commenced to fight, and the witness ran up and tried to assist them, and the defendant ran out of the door, carrying the witness out of the house in front of him, and with Wright swinging to the defendant.

The testimony is too lengthy to be inserted as a whole in the opinion.    There is no dispute, however, that the defendant was standing quietly in Mr. McWhorter's store, and that when these officers told him it was their purpose to arrest him, he asked the nature of the charge against him.    He had the right to this information.    A prisoner arrested by virtue of a warrant has the right to be informed as to the contents of the warrant; and certainly the right of one whom it is sought is to arrest without a warrant, to be informed of the nature of the charge against him, is not less than that of one whose arrest is demanded by the utmost for-

mality of the law,—the mandate of a warrant issued upon the oath of a prosecutor. Possibly such information would be superfluous and unnecessary where the offense was committed in the presence of the arrestor, because the person sought to be arrested might be presumed to know that the act which he had just committed was in violation of law and had been seen by the person who sought to arrest him. But we do not hold even this to be a substitute for the information which every citizen is entitled to have before he shall surrender his liberty and submit the custody of his person voluntarily to the keeping of others. In the present case, when these officers attempted, without a warrant, to arrest the body of the defendant upon the mere oral complaint of another negro, and seize his person, they were guilty of assault and battery. The defendant had the right to defend himself against this assault, and after he had already been seized by two men; and the third (who had a pistol already in his hand) had been told to shoot him, he would have been justified in using any weapon to protect himself. He did not use any weapon at the outset of the assault upon him. It was to his advantage (inasmuch as he was attacked by two men), and certainly to their advantage, if he was physically so powerful as to resist single-handed the assault of two men without the necessity of resorting to a weapon in order to put himself upon an equal footing with the two. Up to the time that he threw the chief marshal through the glass show-case, he used no weapon other than those which nature had provided. The first weapon used in the mêlée was when the defendant was struck from behind with the marshal's billy as he was attempting to make his escape, carrying Wagnon in front of him, and with Wright still attempting to arrest him by swinging to him from behind. If these officers had legally arrested him in the first instance, all that he had done up to that time would have been criminal, and the use of his knife would only have aggravated the enormity of the defendant's offense. Likewise, inasmuch as the officers had violated the law in the first instance, the use of a weapon by the defendant (who was rightfully resisting an unauthorized trespass and who was being assailed by three men all armed with pistols, and one of whom was already using his "billy") was justifiable by every rule of law. We bear in mind that the question of reasonable fears, as applicable to an impending danger, is for the jury, and the judge properly instructed

the jury upon this subject.   But when it is a question of actual danger which no evidence disputes,—where the man who struck the blow with a weapon swears that he "staggered" the defendant, the use of a knife in such moderation as to free oneself from his assailants without inflicting any serious injury whatever upon them is. not stabbing, but justifiable cutting.   It is possible that if the. defendant had cut any of these parties so as to inflict a wound disproportioned to what was necessary to effect his escape (though he was not required to run), or if, in the use of the knife, he had inflicted a wound on either of them of a serious character, the jury might have considered whether, the means of resistance being too great for the exigency, the defendant was or was not guilty of stabbing.   But the undisputed testimony shows that the wounds inflicted by the defendant were trifling in nature and extent.   The. defendant did nothing more than meet force with force, and used no more force in each· succeeding emergency than he had first endured.

2.   The instructions of the trial judge upon the right of one. whom it is sought to arrest illegally were full and correct, and the verdict is contrary to law, in that it is contrary to the charge of. the court.  · We can only surmise that the learned judge overruled the motion for new trial because he was of the opinion that the defendant was shown to have violated some ordinance of the town of 'Buckhead, or because there was testimony that the defendant. was guilty of violating the statute which forbids intoxication in public streets and highways and other public places.   The evidence fails to support this view.   As the court very properly instructed the jury, it had to be shown that the defendant had been guilty of some offense which authorized his arrest at the time of the difficulty in question.   The State's evidence failed to show that the defendant's intoxication was demonstrated in the presence of the officers, by any of those acts (mentioned in the statute) which are sufficient. to raise the inference that the law in question has been violated, at the time that the officers went to McWhorter's store to make the arrest in question.   In order to make the offense it must have appeared that the defendant was doing some act which indicated that his intoxication was offensive, and therefore contrary to public decency.   One may be intoxicated without violating the statute, provided he is guilty of no act which violates public decency.   One

might be ever so intoxicated, even on a highway proved to be a public highway, and yet if he did no act to disturb the public peace, he would be guilty of no offense.

There was no evidence that there is any ordinance of the town of Buckhead forbidding disorderly conduct or classifying the acts which constitute disorderly conduct; and as no ordinance was introduced, the State failed to prove that the acts testified to have been done by the defendant were disorderly conduct. Municipal ordinances and their terms and scope are not a matter for judicial cognizance. Where a right of any kind is claimed by virtue of a municipal ordinance, and more especially where it is sought to impose a penalty, the fact that such an ordinance was passed must be proved. In the absence of evidence that a specified act has been forbidden by a municipality, no presumption can be indulged that such act is illegal.               *Judgment reversed.*