Under the evidence and the rules stated in the opinion, it was for the jury to find whether the arrest without warrant of the defendant by the deceased city police officer was legal because of the commission of a misdemeanor in the presence of the officer, or because of the violation of a city ordinance in his presence and an arrest within the city limits; or whether the arrest was illegal because no misdemeanor was committed in the presence of the officer, or the arrest for the violation of a city ordinance was made outside of the corporate limits; and for the jury to find whether or not the deceased officer used on the defendant unlawful force such as was not authorized in an arrest for a misdemeanor. It was for the jury to determine, under proper instructions from the court, whether or not the homicide was murder, or was justifiable because in defense against an actual felony, or was justifiable because committed under the fears of a reasonable man that such a felony was about to be committed, and not committed in a spirit of revenge; or was voluntary manslaughter. Accordingly, it was error to charge that "a person may kill to prevent an illegal arrest only when it is reasonably and absolutely necessary," since this instruction eliminated the rule of "reasonable fears" under the Code, § 26-1012, and error to fail to charge that rule; and it was error to fail to charge any rule for determining under what facts and circumstances the resistance by the defendant to the arrest would constitute murder, or would constitute justifiable homicide or voluntary manslaughter.
 No. 14602. SEPTEMBER 13, 1943.
Blanton Mullis was found guilty, with a recommendation to mercy, of the murder of J. E. Fennell by cutting him with a pocket-knife. Besides excepting on the general grounds, the defendant excepted to an instruction, and to the failure, without request, to give any instruction, as to the law of justifiable homicide with respect to the rule of "reasonable fears" under the Code, § 26-1012; and excepted to the failure to charge, without request, other rules with respect to the right of the deceased as an arresting officer to use force, and the right of the defendant to resist force if there was an unlawful arrest.
According to the State's testimony, the deceased, a policeman of the City of Cadwell, died within a few minutes after being stabbed in the jugular vein above the collarbone with a pocket-knife, about thirty-nine yards from a negro house; and the homicide occurred inside of the city limits about midnight. Soon afterward, about 12:30 or 1 o'clock the defendant appeared at a *Page 570 
house about one hundred yards away. Two of four persons at this house testified that he then said he had stabbed and "killed Mr. Fennell," with a knife; and that the defendant's head was then bleeding in two places, and it looked like some one had hit him. One testified, that "there were one or two gashes on his forehead and one on the back" of his head; that the witness "noticed blood coming out of these places, and it appeared to me that some one had hit [him] over his head or beat him pretty good. Those were fresh wounds. They were bleeding. I got close enough to him to wipe his forehead. He said that Mr. Fennell did it." One of these witnesses said that the defendant was then "drinking a little;" another, that he "was under the influence of liquor." There was testimony for the State, to the effect that when the witnesses saw the defendant the same evening, but before the homicide, there were "scratches" on his face, which he then said had been caused by a "wreck;" and, as a State trooper testified, that when he examined the defendant at the jail on the following night, there appeared to be an old wound on the side of his head, with "old dried blood there" that did not look like it was made by a blackjack, but "looked more like a cut, about an inch and a half long, . . not very deep;" that "a blackjack will burst the skin, but will leave a bump there; you can knock a man down with it and beat him with it and not kill him." Two witnesses for the State, who saw the body of the deceased when it was found soon after midnight, testified that his blackjack was in his pocket, and his pistol was in the holster that he wore. A witness for the State testified that after the deceased had arrested a companion of the defendant, on the night of the homicide, the witness heard the defendant say he "was a good mind to stab" the deceased, but the witness saw no knife. Another witness said that he saw a knife in the defendant's hand, and heard the defendant say he "was going to stab" the deceased. Both of these two witnesses said that the quoted statements were not spoken to any person, and they were not reported to the deceased policeman. There was no testimony as to any conduct of the deceased manifesting any intoxication until just before the homicide, as hereafter stated; and there was testimony that he had not previously appeared to be intoxicated. One witness testified that at about eleven o'clock on the same night, he had heard the deceased officer tell the defendant, *Page 571 
"I expect you had better go home," although the defendant "wasn't doing anything," and "there wasn't any trouble between them nor no other word said between them."
To prove other admissions by the defendant as to the homicide, the State showed by the testimony of the State trooper that the defendant, when arrested on the day after the homicide, said "he killed Mr. Fennell with his knife;" but that this statement was coupled with an additional one, made in the conversation with regard to a head wound on the defendant, that "he had been hit over the head the night before, . . he didn't know what hit him, . . it was dark; . . that Mr. Fennell had hit him a couple of times, but he didn't see him, . . he didn't know what Mr. Fennell hit him with." Although there was other testimony by the State as to what occurred just before or at the time of the homicide and was heard at that time, there was no eye-witness.
For the defendant, some evidence indicated that the attempted arrest occurred outside of the city limits. There was no evidence from either side as to any city ordinance. Three witnesses at the house where the trouble began, Cap Coley, Eva Coley (his wife), and Lucile McBride, testified for the defendant. Essential testimony of Cap Coley was: "The highway goes by my house. When [the defendant] first came up to my door, he knocked, and my wife, Eva, and Lucile and I were sitting at the fireplace, and he said, `Do you know where any liquor is?' And I said, `No,' and he said, `Give me a drink of water. I am burning up.' And my wife, Eva, got the water and brought it in a dipper. He was standing at the door, and I was just inside the door, and I passed the water to him, and he was drinking his water with this hand [indicating] and holding the shutter with that hand. He turned up to drink the water, and at the time he turned up to drink Mr. Fennell [the deceased] walked up. I don't know which direction he came from. He got him by the shoulder and said, `Hurry up and get it and let's go.' And when he said that, he turned the dipper up right quick and drank the water and passed the dipper to me. Mr. Fennell got a hold of him, and I pushed the door to. . . I could hear a rapping like it was hit on the corner of the post; couldn't tell whether it was hitting anybody or not. After the noise quit, they began to start like they were going toward town, and I heard [the defendant] say to Mr. Fennell, `You knock *Page 572 
the blood out of me.' That was after they had created some disturbance or noise like licks were being passed. I don't know who was passing the licks." The witness said that when he got up the next morning, "there was a little bit of blood" a couple of feet from the edge of the porch — "I don't know who it came off of," and just a few drops leading on toward the way Mr. Fennell was found; and there were signs on the post "like something had been hit on it, but what hit it I don't know." As to what had occurred before the attempted arrest, the witness said that he "did not call any policeman or officer." The defendant "did not disturb me or interfere with me or my family in any shape or form. After he asked for the water he said, `I am as drunk as a son-of-a-b---. That is the only curse word I heard him say. He was drinking his water. . . I said I heard something like beating on a post. Mr. Fennell said, `Hurry up and get it and let's go.' I didn't see no signs of scuffling out there. All I saw was the blood. . . I didn't notice for the scuffling. . . The defendant "had his knife in his hand when I first seen it. I didn't tell you that a while ago when I said he had his hand on the door, because you were asking me so fast. . . He had [the knife] open. . . He hadn't got very far from the house, he had just started away from the house, when he said, `You knock the blood out of me.'. . He said `You told me to go home, Mr. Fennell, and I was going home.' That is all I heard. . . I went up there where Mr. Fennell's body was lying. . . That was about 130 steps from my house. There was a spot of blood at my house about like your hat, and then I said I saw a few drops going up there — a drop or two."
Eva Coley gave testimony similar to that of her husband, except that she did not mention any knife of the defendant, or any statement by him with reference to his being drunk. She said that when he came to her house, he "asked for a drink of water, and I gave him some in a dipper. He was standing in my front door drinking the water, and Mr. Fennell walked up to him and took him by the shoulder and told him to `come on and let's go,' and I closed the door, and I heard some noise, and it sounded like they were in a fight. . . I went out in the yard the next morning and saw some blood in the yard. I saw no footprints and scuffles, and it wasn't much blood. I heard something that sounded like they were hitting each other." The defendant "said to the marshal, *Page 573 
"Turn me aloose, Mr. Fennell, and I will go home. . . [He was] just standing up there asking for water, and he did not act like he was drunk. . . I heard some licks, but I did not know who was hitting them. . . [The blood] was just off from the porch about a step. . . [The defendant] was not disturbing me at my house. I had not called the policeman to come down there."
Lucile McBride, who lived with the Coleys, testified that when the defendant came up and asked Cap Coley for a drink of water, Eva Coley gave the defendant a dipper; that "while he was drinking the water Mr. Fennell come up behind him and said, `Let's go.' . . Mr. Fennell come up to the back of him. When he come up, [the defendant] was drinking his water, and he told him to finish his water and come with him; and [the defendant] said, `You told me to go home, and I was going home.' When they walked off, Cap shut the door. . . I heard a noise on the outside after the door was shut. I heard them scuffling out there, and what they were doing I don't know. I didn't understand anybody say anything." On cross-examination, this witness testified: "I did not hear him say, `I am as drunk as a son-of-a-b —. . .' [The defendant] made the statement `You told me to go home' while he was standing in the door. That is the only statement I heard made by Mr. Fennell or [the defendant]. . . I could hear them scuffling, but could not hear them knocking on the post in front of the house. . . I did not hear [the defendant] say anything about `You knocked the blood out of me.' . . If [the defendant] was drunk, I couldn't tell it, I didn't hear him say that he was."
The defendant's statement to the jury was as follows: "Well, it first started off when me and Bo Murcheson were standing in front of Bob White's and Mr. Fennell come up and started to arrest him, and I tried to get Mr. Fennell to let me take him out of town, and he said, `No,' that he had told him one time, and that was enough; and I went toward the jail to help him about getting out, and Mr. Fennell said if I didn't get away from there he would shut me up, and I went to Bob White's and stayed a little while, and come back toward town and met Mr. Fennell, and he said for me to get out, and I did, and I come by Cap Coley's, and my stomach was burning. I have an ulcerated stomach, and I got the *Page 574 
water and started drinking it, and Mr. Fennell come up and said, `I thought I told you to go home,' and I said, `I will if you will let me,' and I handed the water back to Cap. I told him I would go home if he would let me, and he said, `You are going with me,' and he got me by the belt and jerked me back, and beat me with his blackjack without any cause, and I caught hold of the post, and he hit me licks on the head and tried to make me turn aloose, and he put a big knot up here on my head, and it is still there, and when he jerked me aloose from the post he hit me another blow and jerked my hand up. I had my knife in my hand, and the knife hit him, and he caught me by the hand and said to come on with him, and we got up the road a little piece; he said he was hurt, `Let's go to the doctor,' and I said, `All right,' and he laid his hands on my shoulder until we got to where he fell at. I told the truth about it, and I want you all to believe it. I had ulcerated stomach while I was in the army, and was discharged on that account. I stayed in the army a year and a half, and was in five hospitals while I was in there. They turned me out because of my ulcerated stomach."
Exception was taken to the court's omission, without request, to charge to the jury the rule of the Code, § 26-1012, as to when "reasonable fears" of a felonious assault would justify a homicide, after charging the rule only of § 26-1011, as to justification where one "manifestly intends or endeavors, by violence or surprise, to commit a felony" against his person. Exception was also taken to the charge that "a person may kill to prevent an illegal arrest only when it is reasonably and absolutely necessary," on the ground that this instruction eliminated the question of "reasonable fears" of a felony, and the question of voluntary manslaughter.
Further exceptions were to the failure, without request, to charge that although the mere fact of an unlawful arrest would not authorize a killing of the officer, yet the defendant would be justified if the officer was about to commit a felony on the defendant, or so acted as to arouse the fears of a "reasonable man" that such a felony was about to be committed, and the defendant did not act in a spirit of revenge; the failure without request, to charge that, if there was an illegal arrest, without any crime in the presence of the officer, the defendant could use force against force, just so much as was necessary to prevent an illegal arrest, and if necessary *Page 575 
thus to kill the officer the homicide would be justifiable; the failure, without request, to charge that although no person could justifiably kill another merely because of an illegal arrest, yet if he acted because a felony was about to be committed on him, or because of his reasonable fears of such a felony, and not in a spirit of revenge, such a homicide would be justifiable, and the defendant should be acquitted; the failure to charge as to when the homicide in a case of illegal arrest would be manslaughter and not murder; and the failure to charge, without request, that even if the defendant had violated the law in the presence of the deceased officer, and there was a lawful arrest, yet the officer could not abuse or maltreat the defendant by striking him, unless necessary and to the extent necessary, and if the acts and conduct of the officer were such as to arouse the reasonable fears of the defendant that a felony was about to be committed on his person, and the defendant acted thereon and not in revenge, the homicide would be justifiable, and the defendant should be acquitted. Additional exceptions were to the failure, without request, to charge the rule as to mutual combat with relation to voluntary manslaughter, under the evidence of Cap Coley and Eva Coley; and that if the "motive" of the defendant was to prevent an "illegal arrest," and not a "spirit of revenge," the crime would be voluntary manslaughter and not murder.
The judge charged the rules, under the Code, as to murder, malice express and implied, voluntary manslaughter, justifiable homicide where an actual felony by violence or surprise is manifestly intended or endeavored to be committed; and charged otherwise as above indicated. He charged, with respect to an arrest, the rule under the Code as to when a police officer may arrest without a warrant, and that the authority of a municipal police officer was confined to the limits of the municipality; and that if the arrest was unlawful under the statutory rule stated, the defendant could "resist such unlawful arrest to the extent of such force as was necessary to prevent an illegal arrest," and to "resist an illegal arrest with such force as would be reasonably necessary to prevent such illegal arrest." With respect to the rights of the officer and the defendant, if the jury found that the arrest was lawful, the judge charged that in such event the officer "would have the right to use only such force as was reasonably necessary to effectuate *Page 576 
that arrest; he would not have the right to use force not reasonably necessary, nor . . to use force in excess of what was reasonably necessary to effectuate the arrest, or if no force at all was necessary to effectuate the arrest, he would not be authorized to use any force." The judge further charged that "both officer and citizen, the former in making a legal arrest, and the citizen in resisting an illegal arrest, are under the legal necessity to not use a force disproportionate to the necessities of the situation."
However, as indicated in the opinion infra, there was no instruction as to the doctrine of reasonable fears under the Code, § 26-1011; or as to when resistance of an unlawful arrest would constitute justifiable homicide, and when it would constitute voluntary manslaughter; or as to when, in the case of a lawful arrest but a use by the officer of unlawful force, resistance would be justifiable homicide, and when it would be voluntary manslaughter.
1. Under the Code, § 27-207, "an arrest for a crime may be made by an officer, either under a warrant, or without a warrant if the offense is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant;" and under § 27-211, even "a private person may arrest an offender, if the offense is committed in his presence or within his immediate knowledge." A police officer of a city, in making an arrest for an offense against the State law, or for a violation of an ordinance of the municipality committed in the city limits, falls within the protection of the Code section first above cited. Thus, a city police officer has authority to arrest without a warrant one who violates a State statute in his presence, or to so arrest within the city one who violates a city ordinance in his presence. Graham v. State,143 Ga. 440 (2a, 3a) (85 S.E. 328, Ann. Cas. 1917A, 595);Faulkner v. State, 166 Ga. 645, 665 (144 S.E. 193);Porter v. State, 124 Ga. 297, 300 (52 S.E. 283, 2 L.R.A. (N.S.) 730), and cit.
2. "The term felony means an offense, for which the offender, on conviction, shall be liable to be punished by death or imprisoned in the penitentiary, and not otherwise. Every other crime is a *Page 577 
misdemeanor." Code, § 26-101. "Any person who shall be and appear in an intoxicated condition on any public street or highway or within the curtilage of any private residence . . which said drunkenness or intoxication . . must be made manifest by boisterousness, or by indecent condition or acting, or by vulgar, profane or unbecoming language, or loud and violent discourse of the person or persons so intoxicated or drunken, shall be guilty of a misdemeanor." § 58-608. The statute thus covers the prohibited drunken conduct in any one or more of the ways specified, and not the mere fact of being drunk. Griffin v.State, 183 Ga. 775, 779 (190 S.E. 2); Plemons v. State,60 Ga. App. 639 (4 S.E.2d 681), and cit. (a). An assault with intent to murder, being punishable by imprisonment in the penitentiary, is a felony. Code, § 26-1403. An assault is an attempt to commit a violent injury on another; and a "bare assault" or simple assault and battery is only a misdemeanor. §§ 26-1401, 26-1402. "Whether an assault and battery committed by striking one over the head" with a weapon likely to produce death "would amount to a felony," in that it was done with intent to kill even though death did not in fact result, "would be a question for the jury." Surles v. State, 148 Ga. 537 (4) (97 S.E. 538). See also Wright v. State, 168 Ga. 690 (2) (148 S.E. 731); Tatum v. State, 59 Ga. 638.
3. Where a person is lawfully arrested, either for a felony or a misdemeanor, and he has notice or knowledge, or by belief or reasonable grounds for belief has "the equivalent of knowledge," that the person making the arrest is an officer, it is the duty of the person arrested to submit quietly. Morton v. State,190 Ga. 792, 799 (10 S.E.2d 836), and cit. If, under such circumstances and merely to prevent the officer "from lawfully arresting him in a lawful way," he kills the officer, "the crime is murder." Glaze v. State, 156 Ga. 807 (2-a, b), 813, 814 (120 S.E. 530); Williford v. State, 121 Ga. 173
(48 S.E. 962); Graham v. State, 146 Ga. 18 (90 S.E. 473);Johnson v. State, 130 Ga. 27 (2), 30 (60 S.E. 160);Brooks v. State, 114 Ga. 6, 8 (39 S.E. 877); 1 Wharton's Criminal Law, 778, § 541; 1 Warren on Homicide, 343, 344, § 76.
4. Even though an officer may have a legal right to make an arrest, still he can use no more force than is reasonably necessary under the circumstances, and cannot use unnecessary violence disproportionate *Page 578 
to the resistance offered. 4 Am. Jur. 52, § 3; 6 C. J. S. 612, § 13. Where the offense is a felony, a greater force even to the extent of slaying the offender in order to prevent his escape may, where sufficient circumstances so indicate, be justified. But where the arrest is only for a misdemeanor, such extreme and deadly force merely to effect the arrest and prevent escape is not justified. Newkirk v. State, 57 Ga. App. 803, 807
(196 S.E. 911); Holmes v. State, 5 Ga. App. 166 (2), 170 (62 S.E. 716); 4 Am. Jur. 54, 56, §§ 78, 80; 8 C. J. S. 613, 614, §§ 13-b, c.
5. If an officer who makes a lawful arrest, merely for a misdemeanor committed in his presence, does so in an unlawful manner by making an unprovoked assault with a weapon likely to produce death, and with intent to kill the offender, such as would constitute a felony (Code, § 26-1403); or if the circumstances are sufficient to excite the fears of a reasonable man that such a felony is intended, and the offender slays the officer, not in a spirit of revenge or for the purpose of preventing the lawful arrest, but to protect himself from what is or what reasonably appears to be such a felonious assault, then, in either of such events, the killing would be justifiable. Code, §§ 26-1011, 26-1012; Smith v. State, 147 Ga. 689 (4), 694 (95 S.E. 281, 15 A.L.R. 490).
6. But since an assault and battery is a misdemeanor and not a felony, the mere unlawful striking of an offender, even so as to bring blood, by an officer lawfully arresting him for a misdemeanor would not be sufficient to justify the offender in killing the officer, unless, as stated, the conduct of the officer was such as to excite the fears of a reasonable man that a felony was in fact about to be committed, and the offender really acted on such fears. Code, § 26-1012; Johnson v.State, 136 Ga. 804 (4) (72 S.E. 233); Battle v. State,103 Ga. 53 (4), 59 (29 S.E. 491); Simmons v. State,79 Ga. 696, 700 (4 S.E. 894); McCray v. State, 134 Ga. 416,430 (68 S.E. 62, 20 Ann. Cas. 101); Palmour v. State,116 Ga. 269 (42 S.E. 512); Lyens v. State, 133 Ga. 587, 592,594, (66 S.E. 792).
(a) If a person under lawful arrest for a misdemeanor kills the officer because of an unlawful assault by the officer upon him, even such as to draw blood, but such assault is not so serious as to amount to a felony, or to what would reasonably appear to amount to a felony, then, in either event, the person slaying the officer *Page 579 
would be neither guilty of murder, nor guiltless, but the offense would be voluntary manslaughter. Keener v. State, 18 Ga. 194
(10), 232, 236 (63 Am. D. 269); Simmons v. State, supra;Johnson v. State, 72 Ga. 679, 695; Monroe v. State,5 Ga. 85 (4); 1 Warren on Homicide, 509, § 103, and cit.
7. Where an arrest is not lawful, the person sought to be so arrested, contrary to his right if the arrest had been lawful, has the right to resist, and in doing so "has a right to resist force with force proportionate to that being used in unlawfully detaining him." But, even here, the mere fact of unlawful arrest, in the absence of an application of unlawful force amounting to or reasonably appearing to amount to a felony, will not authorize the killing of the officer. Yet if, in the progress of the transaction, the officer is or reasonably appears to be about to commit a felony upon the other person, such as an assault with intent to kill with a weapon likely to produce death, or by so acting and making such "a show of violence as to excite in the person sought to be arrested the fears of a reasonable man that a felony is about to be committed upon him, and such person acts under the influence of those fears and not in a spirit of revenge, he may protect himself, although it may be necessary to slay the officer for that purpose." In either of the two events just stated, he would be guilty of no crime. Norton v. State,137 Ga. 842 (3) (74 S.E. 759); Shafer v. State, 193 Ga. 748
(4), 756 (20 S.E.2d 34). But if the officer does not attempt or reasonably appear to attempt a felony, but only the misdemeanor of an unlawful arrest, or if the person arrested is only "put in fear of a lesser injury than that of a felony, the homicide would be manslaughter." Wall v. State, 153 Ga. 309
(11), 323 (112 S.E. 142), and cit.; Shafer v. State, supra;Porter v. State, 124 Ga. 297, 305 (52 S.E. 283, 2 L.R.A. (N.S.) 730); Thomas v. State, 91 Ga. 204 (2), 206 (18 S.E. 305); Coleman v. State, 121 Ga. 594 (4-8), 599 (49 S.E. 716); Jenkins v. State, 3 Ga. App. 146, 148 (59 S.E. 435);Perdue v. State, 5 Ga. App. 821, 825-827 (63 S.E. 922), and cit.; Dorsey v. State, 7 Ga. App. 366, 371
(66 S.E. 1096); 1 Wharton's Criminal Law, 779, 780, § 542, and cit.; 1 Warren on Homicide, 345, 346, 505-507, §§ 76, 102, 103.
8. "The law presumes every killing to be malicious until the contrary appears from circumstances of alleviation, excuse, or justification; *Page 580 
and it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury." Marcus v.State, 149 Ga. 209 (99 S.E. 614); Godfrey v. State,135 Ga. 571 (69 S.E. 1080). But "where the evidence relied upon by the State to establish the fact of the homicide discloses circumstances of mitigation or justification, such evidence does not raise a presumption of malice," and in such a case the burden does not devolve on the defendant to show such facts as would reduce the homicide from murder to manslaughter or justify it.Surles v. State, 148 Ga. 537 (97 S.E. 538), and cit.;Wilson v. State, 190 Ga. 824 (9), 832 (10 S.E.2d 861);Brown v. State, 184 Ga. 305 (191 S.E. 108).
(a) In the instant case there was no eye-witness of the immediate homicide. Witnesses for the State, who saw the defendant soon after the killing of the city police officer, testified that the defendant admitted to them his stabbing and killing of the officer; but they also testified that the defendant then had in his forehead and the back of his head wounds which were fresh and bleeding, and that he then told these witnesses the deceased "did it." A State trooper testified that after his arrest of the defendant on the next day, although the defendant admitted having killed the deceased "with his knife," this statement was coupled with a reference to an alleged head wound, and a further statement that the deceased in the dark "had hit him a couple of times," but "he didn't know what [the deceased] hit him with." Under this testimony for the State, as well as testimony by witnesses for the defendant who saw and heard what occurred between the deceased and the defendant immediately before the killing, and also heard, although they did not see, what happened just outside of their home during the actual homicide, one of which witnesses heard the defendant tell the deceased, "You knock the blood out of me," and heard the sound of blows being struck — the burden was on the State to show malice, and that the homicide was murder rather than justifiable homicide or voluntary manslaughter.
In the absence of any evidence as to a warrant or as to any municipal ordinance that was violated, the burden was on the State to show that the defendant had violated some law of the State in the presence of the deceased police officer. SeeGriffin v. State, 183 Ga. 779-781 (supra). While there was testimony that the defendant *Page 581 
had been drinking, there was no evidence of any illegal conduct on his part up to the arrest, except testimony by a witness for the defendant that, just before or while drinking water at a negro house near which the homicide occurred, he had said in the presence of two men and a woman, "I am as drunk as a son of a b —." Under the evidence, the officer appeared about this time; but it is not clear whether he heard the remark, so as to have made it "vulgar," or "unbecoming language" spoken in his presence while the defendant was drunk, and thus, to have authorized an arrest under the Code, § 58-608. Nor was the evidence clear as to whether the arrest was made for either of those reasons, neither of which was mentioned by the deceased to the defendant, or only because the deceased had previously told him to go home and he had not done so, which was the only statement heard by the witnesses, just before the homicide, relating to the cause of arrest.
9. The charge to the jury was for the most part exceptionally able, clear, and fair. But while the judge properly charged generally the law of murder and of justifiable homicide in resisting an actual felony, under the Code, § 26-1011, and correctly charged the general law of voluntary manslaughter, as well as when a police officer can arrest without a warrant, his right to use force reasonably necessary to effect a lawful arrest, and the right of the defendant to resist with reasonably necessary force an unlawful arrest, yet, under the preceding rules and the evidence stated, it was error to charge that "a person may kill to prevent an illegal arrest only when it is reasonably and absolutely necessary," since this instruction wholly eliminated the principle of "reasonable fears" of a felonious assault by the deceased, a resistance to which would constitute justifiable homicide under the Code, § 26-1012.Palmour v. State, 116 Ga. 269 (supra). The judge also failed to charge the rule of that Code section; and failed to give to the jury any guide, in connection with the right of one unlawfully arrested to resist, as to when such resistance would constitute justifiable homicide, and when it would constitute voluntary manslaughter; and failed to give to the jury any rule as to the right of one lawfully arrested merely for a misdemeanor, where the officer uses unlawful force, as to when such resistance would be justifiable homicide, and when it would be voluntary manslaughter. Upon these grounds it was error to refuse a new trial.
Judgment reversed. All the Justices concur. *Page 582