2406.   MAUGHON *v.* THE STATE.

1. On a trial upon an indictment for murder, where the evidence for the State proved murder or voluntary manslaughter, and the evidence for the defendant proved that he was not guilty of any offense, because he did not commit the homicide and was not in any unlawful manner connected with it, and there was no evidence tending to show that he was guilty of involuntary manslaughter in the commission of an unlawful act, it was error to give in charge to the jury the law defining this grade of homicide, and a verdict finding him guilty of this grade should have been set aside, as being without evidence to support it, and therefore contrary to law.

2. Where the undisputed facts showed that a warrant was issued for the arrest of the deceased, and was placed in the hands of the sheriff, who exhibited it to the defendant, a constable of the county, with instructions to make the arrest, and the constable, in pursuance of the request of the sheriff, subsequently arrested the deceased, and the deceased escaped, and, when the constable attempted to rearrest him, "endeavored to escape," it was error to charge the jury, in effect, that the attempted arrest by the constable, without physical possession of the warrant, was an unlawful act.

Conviction of involuntary manslaughter; from Gwinnett superior court—Judge Brand.    January 3, 1910.

Argued March 8,—Decided April 19, 1910.

*J. A. Perry, I. L. Oakes, N. L. Hutchins, T. J. Shackelford,* for plaintiff in error.

*Clifford Walker, solicitor-general, O. A. Nix, W. B. Sloan,* contra.

HILL, C. J.   Maughon was jointly indicted with Kelly Elrod for murder, and on his separate trial was convicted of involuntary manslaughter in the commission of an unlawful act.   His motion for a new trial being overruled, he brings error.   The evidence, briefly stated, is as follows: Criminal warrants had been placed in the hands of the sheriff of the county for the arrest of two brothers, Zack and Jake Cleghorn.   The evidence is silent as to the offense, or offenses, for which these warrants were issued.   The defendant Maughon was a constable or bailiff, and, on Monday

before the Saturday morning when the homicide occurred, meeting the sheriff of the county, he was shown two warrants for the arrest of Zack and Jake Cleghorn, and asked by the sheriff to look for these parties and arrest them.　The sheriff did not turn over the warrants to the defendant, but kept them in his possession, subsequently delivering them to a constable in another district from that of the defendant.　In compliance with the request of the sheriff, the defendant, some time during the week, did arrest both parties, and told them he did so by virtue of warrants which the sheriff held against them.　They made no resistance to this arrest, but on the same day both escaped from the custody of the constable.　On the Friday before the day of the homicide, Maughon again met the sheriff, who again requested him to arrest these parties.　On that day Maughon got his buggy and drove by the home of Elrod, and asked Elrod to assist him in making the arrests.　Elrod consented to do so, and they proceeded to the home of the brother-in-law of the two men for whom they were looking (having been informed that they might be found there), and reached there about daybreak Saturday morning.　Maughon went to the front door and his codefendant to the back door of the house.　Thus far there is no conflict in the evidence, but as to the actual occurrence resulting in the homicide there is sharp conflict. The State introduced one eye-witness of the killing, the widow of the deceased.　She testified, in substance, that on the Saturday morning of the killing her husband came to the house about one o'clock; that he had been to his brother's in Walton county; that he had heard there was a warrant out for him, and she told him that the sheriff had been there and was looking for him; that the two defendants came to the door and knocked, and her husband started to the front door and she followed him; that just as he got to the door one of the defendants took hold of his arm and said, "Let me see who you are;" and that her husband jerked loose and ran out of the door and around the corner of the house.　To quote her exact language: "I seen the pistol fire.　I seen him [meaning her husband] and I seen them [meaning the defendants], and I seen the pistol fire.　Zack was in front of them running.　The officers, Mr. Maughon and Mr. Elrod, were ten or twelve steps behind him, and the pistol shots came right from them two men.　Two shots were fired.　I heard

my·husband say, 'You have shot me,' right when the pistol fired. They fired the shots that way, and he said 'You have shot me.' The men [meaning the defendant] stood and spoke a word or two to one another, and stepped around the right-hand side of the lot. I followed them. I told them I did not .know what they would shoot at him for, that he had not done anything to be shot for. They said, 'Hush, he has gone.' Then they ran through the back yard and through the cotton patch. It was somewhere about five minutes after the shooting before I found my husband, and he was dead. He was lying on his face, with his hands thrown back." In addition to this positive testimony, the State proved that Maughon, subsequently to the killing, made several incriminatory admissions in reference thereto. The testimony as to one of these admissions was, that "he said they shot twice, and the second shot the man hollered. The way I understand, he said they shot twice. He said when the second shot fired the man hollered, and they looked for him and could not find anything of·him, and he said they went back by the widow and told her they guessed he was gone, and they got into the buggy and came back." Another admission proved, and claimed to be incriminatory, was his statement that there were two or three shots fired and that he told his codefendant, Kelly, to shoot. And still another admission proved was that on the next morning, in talking of the homicide, he said, that "he got hold of Cleghorn (meaning the deceased), and he knocked him down and was trying to get his pistol away from him, and he hollered for Mr. Elrod, who ran around there and shot; that Cleghorn had hold of him when Elrod shot the first time; that Cleghorn then turned him loose and ran, and got off about ten steps, and Elrod shot again at him and he hollered, and then Elrod shot again; that Elrod had done the shooting." The foregoing is substantially a statement of the evidence for the State.

Maughon claimed that he did not shoot at all. He said that the deceased came to the door in response to his tap, and he asked him if that was not Mr. Cleghorn, and he replied, "Who are you?" "I said, 'Maughon is my name,' and I took hold of him with my left hand and said, 'Consider yourself under arrest, Mr. Cleghorn.' He then gave me a shove, and we went off of the veranda together, and I still held him by the arm. As I arose he struck me on the side of the face with his fist, and knocked me to my knees. As I

arose again, my pistol was in my overcoat pocket, and he made a grab with his right hand to get it, and he and I were struggling for the possession of the pistol, and I hollered for Kelly Elrod to come around here, right around here, and as Kelly came, he cried out, 'Halt, halt,' and fired twice.    He fired up in the air, and not in the direction of the deceased.    The deceased ran away, and in a few seconds a third pistol shot was heard in the direction in which the deceased ran."    He denied that he had made the incriminatory statements shown by the State.    He corroborated his statement by his codefendant, Elrod, who swore that he saw Maughon and the deceased in a desperate struggle, struggling to get possession of something; that he ran up and hollered, "Halt, halt," and fired straight up, and the deceased turned and ran off, and in a few seconds another shot was fired, at the back of the house, in the direction in which the deceased ran.    According to the statement of the defendant Maughon to the jury, and the testimony of Elrod, neither was aware of the fact that the deceased had been killed that night.    The defense contended that the third shot killed the deceased, and that this shot was fired by his brother, Jake Cleghorn, who ran out of the house at the time the deceased did, but in a different direction.    In support of this theory there is some circumstantial evidence, which it is not deemed necessary to set out, and what is claimed to have been a statement of the brother, Jake, made to a neighbor on the morning of the killing, but which was denied by the brother.    The jury, in the exercise of their exclusive right, discarded both the evidence for the defendant and this theory of the defense, and found the defendant guilty of involuntary manslaughter in the commission of an unlawful act.

We would not disturb the verdict if, after a most careful examination of the evidence, we thought there was any fact or circumstance upon which it could have been based.    The evidence for the State, taken at its strongest, if it was the truth, demanded a verdict for murder.    This evidence contains no suggestion of any assault made by the deceased upon the defendant, but shows that the deceased, while running away from the defendants and endeavoring to escape, was fired on from the rear by them, one of the shots proving fatal.    The State, however, did not contend that the defendant Maughon fired either shot, but it did contend that the fatal shot was fired by the defendant Elrod, under the order and di-

rection of·Maughon; that at the time the shot was fired and the order given to shoot, the deceased was running from both defendants. If the deceased, at the time he was shot, was running away from the defendants, not having made any assault upon either one of them, and was simply endeavoring to escape, and Maughon called upon Elrod to shoot him, and he did shoot him, both would be guilty of murder, one as·the actual perpetrator of the offense, and the other as aiding and abetting its commission. This result would not be in the slightest degree affected by the additional fact that the deceased was attempting to evade arrest, whether the attempted arrest was lawful or unlawful. The record does not disclose for what offense the warrants against the deceased and his brother were issued, but it was stated in the argument before this court that they were for the offense of selling liquor, which is simply a misdemeanor. It is well settled that an officer may not exert force in effecting an arrest for a misdemeanor, or in preventing the escape of one charged with a misdemeanor, to the extent of employing a deadly weapon, or of taking life, though without such force the wrong-doer may escape (*Holmes* v. *State*, 5 *Ga. App.* 166 (62 S. E. 716)); and this is so whether his purpose is merely to kill or to stop the other's flight. Wharton on Homicide (3d ed.), §500. The jury, if they had believed that the deceased made an assault upon the defendant and struck him down twice, as he claimed in his statement, and had further believed that, smarting under this provocation and acting under a sudden heat of passion provoked thereby, he either shot at the fleeing deceased himself or ordered his associate to shoot, they might have been justifiable in finding a verdict against him for voluntary manslaughter. But we can not find anywhere in the evidence, or in any reasonable inference fairly deducible therefrom, any support for the theory of involuntary manslaughter in the commission of an unlawful act.

The judge of the trial court charged the jury as follows: "If you believe that the defendant and Elrod undertook, without a warrant, to arrest the deceased, and that he resisted the arrest and released himself from the custody of Maughon and began to run away from him, and, while thus running and when he was endeavoring to escape, Maughon ordered Elrod to shoot him, and Elrod, in response to this order, fired at the deceased and killed

him, then this shooting and killing was unlawful, and both parties would be guilty either of murder or involuntary manslaughter in the commission of an unlawful act,—the former (that is, murder) if Elrod shot with intent to kill and the killing was done with malice, and the latter (that is, involuntary manslaughter) if Elrod shot without any intention to kill." We think this charge was erroneous for several reasons, not for the merely theoretical idea that one person can not aid and abet another in the commission of an involuntary act (for, as to the facts of this case, this question, while it may be interesting, is entirely theoretical), but because there is nothing in the evidence upon which the charge could have been based, as, under the evidence, the defendant was guilty either of murder or of voluntary manslaughter, or was not guilty of anything at all. Neither was the charge a correct statement of the law of involuntary manslaughter. Section 67 of the Penal Code defines involuntary manslaughter as follows: "Involuntary manslaughter shall consist in the killing of a human being without any intention to do so, but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: *Provided,* that where such involuntary killing shall happen in the commission of an unlawful act which, in its consequences, naturally tends to destroy the life of a human being, or is committed in the prosecution of a riotous intent, or of a crime punishable by death or confinement in the penitentiary, the offense shall be adjudged to be murder." Now if the defendant Maughon ordered Elrod to shoot the deceased when the deceased was running away from him, and in response to this order Elrod fired at the deceased and did kill him, the shooting and killing was not involuntary manslaughter, but would be deemed and adjudged to be murder, because the killing was done in the commission of an unlawful act, to wit, shooting with a deadly weapon at one charged with a misdemeanor, who was simply endeavoring to escape,— an act which in its consequences naturally tended to destroy the life of a human being. And besides, to shoot at another under these circumstances would be, even if he were not killed, the commission of a felony,—the offense of shooting at another, or that of assault with intent to murder. Therefore this charge, construed in connection with the above definition, would have made the defendant guilty of murder, unless mitigated by the facts to voluntary

manslaughter, and not of involuntary manslaughter; and we conclude that the assignment of error on this portion of the charge should be sustained.

Objection was made to the following charge of the court on the subject of arrest: "If the defendant Maughon went to where the deceased was spending the night, without a warrant, and then and there undertook to arrest the said deceased in the absence of any warrant or other lawful authority, he, the defendant, was acting illegally, and the deceased had the legal right to resist this illegal act, and to use, in resistance, as much force as was necessary to make resistance successful and to secure his successful escape." As an abstract proposition of law, this charge is correct, but it was not applicable to the facts of this case, and was calculated to mislead the jury and to prejudice the defendant, especially to prejudice him when taken in connection with the instructions on the law of involuntary manslaughter in the commission of an unlawful act; for it was not denied that the defendant did not have in his actual possession a warrant, and the conclusion was inevitable, from the charge, that if he had no warrant, the attempted arrest was an illegal act, and that if the killing was the result of this illegal attempt to arrest, the defendant would be guilty of involuntary manslaughter in the commission of an unlawful act. In the first place, under the facts of this case, a warrant was not necessary for the arrest of the deceased. The defendant was a constable. He had previously arrested the deceased, who had escaped from his custody. He was then a fugitive from arrest, and was actually endeavoring to escape when the arrest was attempted; and, under section 896 of the Penal Code, an officer can arrest without a warrant "an offender who is endeavoring to escape." This can be done even where the offense is less than a felony. *Croom* v. *State,* 85 *Ga.* 723 (11 S. E. 1035, 21 Am. St. R. 179). But we do not think that the question of the legality of the attempted arrest was at all material to the issue in this case. It was not material to the contention of the State, because that contention was that the deceased was fleeing from the defendants when he was shot; and whether he was fleeing from an arrest for a misdemeanor, legal or illegal, the killing would clearly have been murder or voluntary manslaughter. It was certainly not material to the defense; for the defendant contended, not that he was authorized to

make the arrest and killed the deceased because he was resisting such lawful authority, but that neither he nor his associate shot at the deceased at all,—that the deceased was shot by his own brother or some other unknown person, who mistook him for an officer.

Because of the two errors herein discussed, we think that the case was not properly submitted to the jury, and that the verdict for involuntary manslaughter in the commission of an unlawful act was wholly unsupported by any evidence, and a new trial should be granted. *Judgment reversed.*