## FAULKNER *v.* THE STATE.

1. Where the deceased was shot by the defendant on Thursday night, one ball entering his left arm, and shattering the bone of this arm, and another ball entering the left leg, and shattering the long bone in his thigh, and where the deceased died from the result of these wounds at 1:30 a. m. on the following Wednesday, the trial judge did not err in admitting as a dying declaration his statement as to the cause of his death and the person who killed him, made on the day following the one on which he was shot, the deceased stating that he felt that he would not recover, and that if anything happened he wanted to give an account of the manner in which he was shot by the defendant, notwithstanding the fact that his medical attendants did not consider him in a serious condition until the following Tuesday, when they discovered that he was infected with blood-poisoning; the objection to the admission of such statement being that the preliminary proof failed to show that the deceased was conscious of his condition.

2. The trial judge did not err in giving to the jury the instruction dealt with in the second division of the opinion, upon the ground of exception urged thereto.

3. An erroneous instruction upon a theory of defense not authorized by the evidence does not require the grant of a new trial.

4. The trial judge did not err in giving to the jury the instruction dealt with in the fourth division of the opinion.

5. The court below did not err in failing to instruct the jury that under the evidence the arrest of the defendant was illegal.

6. Where a defendant was indicted and tried for the murder of a policeman, and separately indicted for an assault with intent to murder another policeman, both offenses growing out of the same transaction, a ruling by the trial judge that the relatives of the latter policeman were competent jurors to try the defendant for the murder of the policeman who was

killed, even if erroneous (on which we pass no judgment), does not require the grant of a new trial, it not being made to appear that any relative of the living policeman served upon the jury who tried the defendant, or that the defendant was compelled to exhaust his peremptory challenges in getting rid of such relatives, for which reason he could not challenge other objectionable jurors, or that the State was in any way benefited by such ruling.

7. The questions propounded by the court to a witness, and set forth in the tenth ground of the motion for new trial, did not amount to an expression of an opinion upon the evidence.

8. The verdict is supported by the evidence.

No. 6497. MAY 17, 1928. REHEARING DENIED AUGUST 22, 1928.

Murder. Before Judge Fortson. Walton superior court. February 13, 1928.

Oscar Faulkner was indicted and tried for the murder of Erastus Moon. The jury returned a verdict of guilty, with a recommendation. The evidence of the witnesses who were sworn on the trial was substantially as follows:

W. J. Mayfield: He and Moon, who were policemen, were called by the defendant to go down to a filling-station in the City of Monroe. They found that there had been a collision between the automobile of the defendant and that of one Collins. Those two could not agree as to who was at fault, and called Mayfield and Moon to straighten it out. Moon told the defendant that it was not their business to settle this dispute. The defendant cursed Collins, and told him that if he did not fix his car he was a d. s. of a b. The policemen kept them apart. Moon put the defendant under arrest for cursing and being drunk and disorderly, and placed him in charge of Mayfield. Moon put the defendant in the car of Mayfield. The defendant asked Moon what was to become of his wife and children, who were with him in his car when the collision occurred. Moon said to defendant's wife, "Get your things out of the car there and the children, and we will drive by and leave you there at the house." When they reached his home, the defendant opened the car door. Moon said to him, "You stay in the car." The defendant mumbled that he would be damned if he went anywhere. Mayfield opened the door and went around the front end of the car. Moon had got out on the right-hand side of the car. Just as Mayfield got at the front wheels he heard the defendant's pistol snap. "I made a lunge at the defendant, when his daughter butted me and threw me to the side. The defendant shot me through the hand.

There wasn't a word spoken. I had no pistol in my hand, and did not have a chance to get one until I was shot. I had not reached for my gun at the time I heard the pistol snap. Did not touch the defendant when I made the lunge, but I was close enough as defendant pulled his gun for the powder to burn me. My clothes were shot. What first attracted my notice was the snapping of the defendant's pistol as it came out of his pocket, and the next thing was the lunge to get defendant's pistol. Defendant shot me as I lunged. I was shot in both hands. Could not tell whether I was shot with one shot or not. A daughter of defendant butted me in the stomach to keep me from getting to her father. After I was shot the defendant turned half way around and shot Moon. I got my gun from the scabbard, but didn't have strength enough to pull the trigger, and found I was shot. Did not know I was shot until then." The defendant stepped up on his porch and said, "I have got one of the damned bullies, and that is my part." When Mayfield reached for his pistol, defendant was shooting Moon. He shot four times altogether; twice at Mayfield and twice at Moon.

A. S. Williamson: I am chief of police of the City of Monroe. Visited Moon several times after he was shot. The second night after the shooting I had a conversation with him. Malcom and I, and possibly one or two others, visited Moon the night following the shooting. We started to leave and got out in the hall, when he called me back, and said, "Ed, I just want to tell you, if in case anything happens, I want you to know that this man shot me for nothing; and I feel that I am not going to get over it." He then told me the details of the shooting. He told me that they got a call to go to Martin's store. He said he and Mayfield went down, and when they got there they found the defendant and one Collins had had a wreck. He said, "Faulkner called us up and wanted us to come down and make Collins pay for the damages to his car." He said, "I told him we didn't have anything to do with damage suits, that we couldn't settle damages." He said, "So I told him if he wanted me to I would have them both come to court Monday, and they could settle it before the mayor, and they went off to one side." In the conversation he gave me to understand that he, Collins, and the defendant left the crowd, and the defendant told Collins unless he paid for his car he was a d. s. of a b., and Moon told the defendant there was no use of cutting up that way, and he

said, "I told him he would have to stop that, and that he would have to consider himself under arrest." He said, "I told him to get in the car, and I put him in the car with Mayfield, and his wife said something about how would she get home, and I put her in the car in the back seat with me, and as soon as we stopped the defendant jumped out, and I got out and told him to get back in the car. His wife was talking to me and begged me not to take him. The next thing I knew the defendant was shooting at Mayfield," and he said, "When I realized that he shot Mayfield I reached for my gun, and the defendant shot me in the leg before I could get it out." He said, "I fell on the ground, and I could hear his pistol snapping several times." He said when the defendant did that, he backed up on the porch and said, "I got two of the damned bullies," and that he reckoned that was his part. He said that they could hear defendant in the house rearing and wanting more cartridges, calling for his gun, and saying he would clean up the whole damned works.

Dr. H. B. Nunnally: Was one of the attending physicians on the deceased. He died about 1:30 o'clock on Wednesday morning. His death was due to a bullet wound. One wound was about three or four inches above the left knee. It fractured the long bone in the thigh. The other wound was in the lower third of the left arm. It shattered this bone in the arm. Was at the hospital the night deceased died, and his mind was perfectly clear. His condition, however, was very grave. He was in the article of death. He made a statement to Dr. Aycock and myself. The substance of it was that they had brought the defendant and his wife and children up to the house, and they got out. He told the defendant he had better get in the car, that they were going to take him on to town, when the defendant kinder backed back towards the porch, and I believe he said, "No, you will not take me anywhere," and drew a pistol and began firing, that he shot Mayfield first, and that as he shot at Mayfield the latter reached for his pistol, and as he was pulling it out of the holster on his hip the defendant turned and shot him in the leg, and caused him to fall, and he shot him again; and he said, "I don't know whether he shot me the second time in the arm when I was falling, or after I hit the ground." Witness did not become alarmed over the condition of the deceased until some time before eleven o'clock on Tuesday night. His temperature was

normal on Tuesday. Had Doctor Goss in consultation on Monday night, and he said that he did not know whether deceased's condition was favorable or not, because blood poison might set up, and that he had a fight for his life. We both feared blood poison on account of his having had it before. We saw no indication of that until Monday. On Tuesday morning his temperature was normal, and we felt better about his condition, but it went up to about 100 at noon, and then it went down to normal and stayed normal until he died.

Doctor T. R. Aycock: I am a first cousin of the deceased. Was one of his attending physicians. Was present when he died. I think the diagnosis was septicæmia, or infection, following gunshot wounds. He was in the article of death about 11:25, and made a statement in my presence. I said, "Erasmus, did you get shot?" He said, "Yes." I said, "Who shot you?" and he answered "Faulkner." I said, "When did this happen?" and he said, "It happened the other night." I said, "Why did he shoot you?" He said that some time during the night he got a call to go down to Martin's filling-station, and he and Mayfield got in the car and went down there, and when they arrived there was some little fuss or confusion between Moon and Collins, I believe, and that defendant was cursing, and he told him he would have to stop that, and that he would have to consider himself under arrest, and then he said he and Mayfield and defendant got in the car and went to defendant's home, and when they arrived there defendant got out of the car, and Moon followed and tried to catch him, and that his wife, I believe, interfered a little bit, and begged Moon not to put him under arrest, saying that if he did it would make one of his children crazy; that when he got out and followed defendant, Mayfield got out and went around the car, and after they had been conversing there a little, defendant said, "None of them will put me under arrest," and began shooting; and that he (Moon) then reached back in his pocket, and as he did so he got shot in the leg; that he didn't know when he got shot in his arm, and that when he fell he fell on his pistol and never did get his pistol. I asked him if Mayfield or he either one shot any, and he said that neither of them shot. Doctor Nunnally was present and heard the same statement. He made this statement almost precisely two hours before he died.

J. W. Arnold: Was there the night Moon was shot. There were

four shots. The defendant's little daughter came and knocked at my door and said, "Come out and help get Mr. Moon up. Father has shot him." I went out there. When I got there I said, "Are you hurt, Mr. Moon?" He said, "I am hurt bad." He said, "Well, stay with me." I said, "All right, I will stay with you." Saw the defendant in the house. He was hollering and going on, and said, "Give me my gun." About that time some boys walked up, and he said, "I will clean up the whole damned crowd," and the boys ran and left me. Moon looked up and said, "Don't let him come out here." I said, "He isn't coming out here." He said, "Are you going to stay with me?" I said, "Yes." Moon did not have his pistol in his hand, but he said, "Feel in my pocket and get my pistol, and protect yourself if he comes out here with a gun."

E. S. Gordon testified: I am sheriff of this county. Went to the defendant's house. His wife gave me that pistol, and it is now in the condition that she gave it to me. She got it out of a barrel in the back room. The defendant looked like he was under the influence of whisky, but he was not drunk. Riley ran his hands over the defendant to see if he had a gun, and asked him if he had one, and was he the man that done the shooting. The defendant told him he was. Defendant showed no signs of staggering until after he got in the jail. He then looked like he was fuller.

J. M. Riley: The defendant had been drinking some, for I smelled whisky on him; but he was not drunk. His reputation was good, so far as I know. I never heard a word against him in my life.

C. J. and Guy Sorrells testified: Were down at the filling-station where they had an automobile wreck. The defendant's car was sitting on the right-hand side of the road. Saw the defendant, Mayfield, and Moon down there, but did not see any disturbance of any kind. Did not stay but a few minutes, and never heard either of them speak. The defendant's action did not indicate that he was drinking. Did not see the police arrest him, or anything of the sort. Did not hear the defendant do any loud talking. Had known the defendant twelve or fourteen years, and so far as I know his character is good.

Henry Clegg: Was down at the filling-station after the wreck occurred. Saw the defendant there, but could not say whether he was drinking or not. Did not see anything in his actions that would

indicate such. Saw him talking with the policemen, but they did not seem to have any trouble. Have known the defendant six or seven years, and he seemed to be a peaceable man.

George Gregg: Came by the filling-station and saw where they had a wreck. Have known the defendant four or five years, but have not seen him often during this time. He was standing across the street that night, talking to Moon. There was no disturbance going on that I saw. The defendant did not indicate by his actions or manner that he was drinking or drunk. Stayed there about five minutes. Did not hear him curse any. Don't know what took place between him and the officers.

Jess Donehoo: Was down at the filling-station that night, about two minutes after the accident. Was there when Moon and Mayfield came. The defendant was just standing around there. He did not seem to be drunk, and was not having any trouble with the officers. Was not close enough to hear what they were saying. Was there all the time the policemen were there, but was not paying any attention to them. Could not tell the conversation that took place between Moon and the defendant, because Moon took him on one side of the street and I was on the other. They all left there in a car together. The defendant and Mayfield were on the front seat. Mrs. Faulkner was out there trying to get them to take her home.

Jesse Powers: Was at Fambrough's house that night. I said to Press that I heard a pistol shoot. The shooting was close together. Went down there, but did not see Mayfield. Saw Moon lying out there, and brushed his hair out of his face, and asked him if he wanted me to pull off his shoes. He said, "No, untie them." Moon and I never said anything in reference to his being drunk, but there was a man walked up to him and said, "That is what whisky will do," and Moon said, "If he was drunk I could not tell it." Went into the house of defendant. Lots of people were there. Defendant was sitting in a chair, talking to his children. Was pretty close to him, and never heard him curse any, or talk loud, or threaten to kill anybody. He was quiet the whole time. Have known the defendant about four years. Lived in the house with him a long time; and he is not fussy, but peaceable and quiet.

Naomi Powell: Was down at the defendant's on the night in question, and saw him. "If he was drinking I couldn't tell it."

Jim Perkins: I have known the defendant about eighteen years.

Have always known his character to be a man of peace. He had no disturbances with anybody. He is a good workman.

W. A. McDonald: Have known the defendant intimately ever since 1906. He is a peaceable man, character good, and I never knew anything wrong with him. This is the first row I ever knew him to be in.

W. O. Roberts: I have known the defendant sixteen years. He lived with me, and I knew his character to be good. He is a peaceable man, as far as I know. I never heard anything to the contrary.

Lokey Gunn: I asked Moon how come the defendant to shoot him. I asked him if the defendant was drunk, and he said the defendant was not drunk. He asked me to notice the defendant to see that he did not run off.

Elmer Martin: Was at the hospital with Archie Preston on the night when Mayfield and Moon were carried there. Heard a conversation between Moon and Ed Williamson. Moon told Ed Williamson to be as light upon him as he could.

A. B. Preston: I am a councilman of the City of Monroe. Was at the hospital and heard a conversation between Ed Williamson and Moon. Could not understand what Williamson said—something about twenty years; and Moon turned to him and smiled and said, "You be light on" the defendant.

Troy Preston: I am a member of council of the City of Monroe. Went down to the hospital the night after this trouble. Went into the room where Mayfield was, and asked him what in the world was the matter, what happened. He said, "You see what happened; I got shot." I said, "Was the fellow drunk who caused the shooting?" He said, "No, the fellow wasn't drunk; just shot us up there." And somebody in the door said, "Yes, he was drunk."

J. L. Hanson: Was down at the filling-station about three minutes after this wreck happened. My wife was with me. Was there when the policemen came and when they left. They were there about fiften or twenty minutes. Never saw any disturbance of any kind, no cursing, or no arrest that I know of. Saw the defendant there. Did not see him do anything to indicate that he was drinking. He was excited over the wreck. He and Moon were on the other side of the road, and I was standing at the filling-station. Do not know what they did on the other side of the road. Was not there when they put him under arrest, but I said to the defendant,

"If they arrest you I will go on your bond." I offered a cash bond, and Moon said, "I am going to carry the man and his wife home." He said to me, "You come to-morrow evening at 2 o'clock." Made the offer to go on his bond or put up a cash bond before Moon carried him off across the road. When Moon came back from over there, I said to him, "Did you arrest him?" and he said, "No, I am going to carry him and his family home." Did not hear Mayfield tell the defendant to get in the car. Saw his wife get in Mayfield's car, in the back seat, with two or three children. Moon said, "You all come to-morrow at 2 o'clock." He was going to make cases against them for reckless driving.

Mrs. J. L. Hanson: Was with my husband at the filling-station on Thanksgiving night. Saw Moon, but did not see Mayfield. Moon told my husband and Elmer Martin to come to town the next evening. He said he was going to make cases against these two boys, and for them to come at 2 o'clock the next evening. I did not hear anything about the bond. Did not hear any cursing or one word out of the way. Moon, the defendant, and all of them did not seem like they were mad. Moon was laughing and talking. The defendant did not seem like he was drinking. Was not with my husband at the time he offered to give bond for the defendant.

H. M. Batchlor: Was in the car and saw the wreck. The defendant was on the right-hand side of the road, and this other man was on the wrong side. Did not see the defendant do anything, or see any indications of him being drunk. His wife drove the car a part of the way until it got to jumping and popping, and she got afraid and asked the defendant to drive.

DeWitt Powers: Went with the defendant, his wife and children. The defendant was not drinking or drunk. He was on the right-hand side of the road at the time he had the wreck. When I saw the cars they were right together. The defendant's car was facing towards town. Both cars were on the right-hand side. Was there when the policemen came down, but never heard of anybody being arrested, nor cursing or any trouble. Was in the filling-station when Moon had the conversation with the defendant. Saw them get in the car with Mayfield.

Ollie Fowler: Took dinner with the defendant. Was there when he came back with his car from Malcom's. Was with him until he left for Social Circle. Never smelled any whisky, or saw anything that indicated that he had had a drink.

Sarah Faulkner, daughter of the defendant: Was the only large daughter that was out there during this difficulty. Was not at home when the car drove up with my father, mother, and Moon, but was up at the next house. Went on down home, and when I got there I saw Papa, Mama, Moon, and Mayfield getting out of the car. Was at the steps when the shooting started, but did not butt into Mayfield. Was standing by Papa, but was not touching him when the shooting started. Mayfield was standing in front and Moon behind. Mayfield came from behind Moon, had out his gun, and it was pointed in the direction of Father and me. Up to that time Father had not done anything to them. Can't tell how the shots sounded, for they excited me. Did not hear but one. Did not make any assault on Mayfield. I weigh only 84 pounds. Never smelled any whisky on my father, and did not see anything that indicated that he was drunk or drinking. Moon was standing on the side of the car. Mayfield came around the front. My father did not have a pistol in his hand, but he pulled it out of one of his pants pockets. He did not have his pistol out. Mayfield got his pistol out of his pocket. My father shot first, and he shot second, but don't know how much break was between the shots, because the first shot frightened me. If Mayfield tried to shoot, I didn't see him. He did not reach for my father's hand. When my father shot he had his left hand this way, and the other hand down at his side. He had his pistol in his left hand. When my father shot with his left hand, Mayfield caught the pistol then. He caught with his hand that was shot, and my father shot his other hand. Moon just stood there. Then my father shot twice more, and Moon fell. Moon walked down a little piece before he fell. After my father shot, Mayfield ran. After my father shot the second time and shot him here, Mayfield turned around the car, and was gone as much as ten feet before my father fired the third shot. Mayfield had gone that distance, and my father had shot twice more, and Moon was shot, staggered and fell, and Mayfield was about 10 feet on his right when Moon was shot.

Clayton Faulkner: I am 14 years old. When the car drove up to my father's home with Moon, Mayfield, my mother, and the little girls, we had been playing out at the store, which was near our home. They had time to get out of the car, and were standing there talking before I got down to where they were. Saw Moon

and Mayfield. Mayfield was standing there talking, and my sister Sarah came out of the door and saw the police, and commenced crying, and grabbed Papa around the neck. Moon told Papa he had to go to town, and slapped Sarah and told her to get away from Papa, and when he did Mayfield jerked out his pistol and drew it on Papa. Moon started to get his, and Papa commenced shooting; and after he shot, Moon fell and Mayfield went on up the road, and Papa went in the house and sat down. Was looking at Father at the time of the shooting. Mayfield had his gun drawn on him; he was pointing it at Papa. He had it drawn right straight on him, that way. Heard the shots, and they were just as fast as any one could shoot them. There was no interval between them. Up to the time Mayfield pointed his gun at Father, Father had not done anything to any of them. Never heard any cursing.—Cross-examination. Did not get there before they got out of the car. Moon and Papa were talking. Moon told Papa he had to go to town, that he was under arrest. Father told him that he hadn't done anything to go to town. When I came up, Papa, Mayfield, and Moon were talking. Sarah came out out of the house and grabbed Papa around the neck. Moon slapped her and told her to get away from Papa, and Mayfield jerked out his gun and drew it on Papa. Moon reached to get his gun, and Papa shot him. Papa shot Mayfield first, in the hand, they said. Mayfield and Moon were right close together when Father shot Mayfield, Moon sort of back of Mayfield. Mayfield had not gone when Father shot Moon. Mayfield acted like he was shot, and started walking off. Mayfield and Moon were shot. Father didn't turn any before he shot Moon. Never saw Father get his pistol until after he started shooting. He then walked in the house. He never said anything.

Paul Mobley: Was down at the defendant's the night of this shooting. The car had been at the defendant's just a few minutes when I got there. They were out of the car. Heard some shots, and they were just as fast as they could be pulled. Saw Mayfield at the time the shooting took place. He had his gun in his hand. Defendant was standing at the edge of his steps, and Moon reached back this way to get his gun. Mayfield was standing about as far as from here to you, from the defendant. Moon was standing a little bit further, to the right of Mayfield. Up to the time Mayfield had his gun pointed at the defendant, the latter had done nothing

to him, as far as I know. I saw the pistol in Mayfield's hand, and Moon had his caught like that. Four shots were fired. Ran after the two first shots were fired, and don't know who shot first. Up to the time I ran Moon and Mayfield had not got together. One never got in front of the other. If anybody hit Sarah I didn't see it.

In his statement to the jury the defendant said: "Gentlemen, there has been something said about me taking a drink of whisky. Don't deny taking a drink, but never abuse it. I take a dram sometimes. I do not get drunk and get down, nothing like that." He gave this account of the shooting: His car was wrecked in a collision. He and the driver of the other car talked about it. "He seemed to think he was in the right. I knew I was right. I was on my side of the road. We could not agree on it. I says, 'Well, if we can't agree on it, I will call the police and see if they can decide, while the car tracks and everything is here.' I telephoned Moon, who was a policeman. I told him I would like for him to come down there. He said, 'All right.' I went on back to the filling-station, and about the time I got there Moon and Mayfield rode up. Mayfield went on down around the wreck and looked around it a while. I went on down there too. Directly Moon called me off across the street. We were standing over there talking, and this fellow Collins [the driver of the other car] came over there, and he commenced disputing my word. It flew all over me. I will admit that I said things I was sorry of in a second. Moon said I ought to be ashamed, and I was ashamed of what I said. I went on back, and Moon came back down there and was talking to all of them. He says, 'Well, I will just make a case against both of them, and you all come up to town tomorrow at 10 o'clock.' I understood, and he said he would carry me and my wife home. During this time Hanson said, 'If you are going to make a case against the defendant I will go on his bond.' Moon says, 'No, you all be up there at 2 o'clock, and I will carry them.' There hadn't been anything said about locking me up. It was my understanding that he was going to carry us home and put us out. When I started up there to call the police up, I had my pistol under a little cushion that lay on the seat. I thought about leaving the pistol in my car, stepped back, and got it and stuck it in my pocket. When we got in the car I got in the front seat with Mayfield and Moon, and my wife and children got in the back seat. When we drove up in

front of my house I was on the right-hand side, and Moon and my wife were on the back seat. I stepped out. Moon got out and helped my wife and children out. I said, 'Gentlemen, you all come in.' They said, no, they had to go on to town. About that time little Sarah ran up and grabbed me and was taking on over me. Directly she got loose from me. Me and Moon were arguing about his going to bring me to town. I told him I didn't want to be locked up, and my little children all around me crying and going on; and while we were standing talking, Mayfield came around kinder in front of Moon, and when he did that he threw his gun on me, and when I saw that gun, and my children around me, I couldn't describe how it looked. I couldn't tell my feelings, and when I saw there was me and my children, all of them screaming and taking on over me, and when I shot out that pistol, I shot four times, as fast as I could pull the trigger, and when Mayfield turned around I never knew Moon was shot until he fell on the ground. If I had wanted to kill a man as big as they were and as close as they were to me, I would have shot them in the body. I didn't know whether either one of them were hit. When I did that I walked back to the door, turned around and went to my wife, and says, 'Take a quilt or pillow and put under that man's head.' When I did that I sat down in the rocking-chair and stayed there until the law came."

Willis Collins: Was in the automobile that had the collision with the defendant that Thanksgiving night. My car was struck at the filling-station. I had turned in, and my car was partly on the street and partly on the filling-station property. The defendant wanted to call the officers down there; and when he called them and they got down there, Moon, myself, and the defendant went off over across the road where we had the wreck, and were standing there talking. The defendant was insisting on my paying for his car, paying the damage I suppose. He said to me, "If you don't pay for my car, you are just a God d. s. of a b." Moon told him that he could take care of him, and carried him over and turned him over to Mayfield. The officers told us the only way we could settle it was to give us both a copy of the charges for reckless driving. Don't remember whether this profanity happened before or after he told us he would make a case against me. The last thing I heard Moon say was, "If you can't keep quiet I can take charge of you;" and

he carried the defendant and turned him over to Mayfield. Moon then came back to the car to investigate the wreck.

The defendant moved for a new trial upon the general grounds, and by amendment added the following grounds:

4th. That the court erred in admitting as dying declarations the statements which A. E. Williamson testified the deceased made to him as to how the shooting took place.

5th. That the court erred in charging the jury as follows: "Now as to any disparity in the size between the parties, if any, I charge you that our law is this: If the jury find that the deceased was the aggressor without sufficient provocation, and you also find that there was great discrepancy or inequality in the strength of the parties on account of their physical condition, and the defendant was unable to defend himself without the use of a weapon, and he used the weapon in self-defense, and did not act beyond the apparent danger, if any, then if that is the fact of the case it would be the duty of the jury to acquit the defendant. If he did not act beyond the apparent danger, if any, then you may consider the inequality or discrepancy in determining whether it was such as under the circumstances should mitigate the offense, if any, from murder to manslaughter. If you find the discrepancy did not affect the defendant in his conduct, then the rule would not apply. The discrepancy in the relative strength must be a considerable discrepancy; that is to say, a discrepancy that is appreciable." Movant contends that this charge was limited to the deceased, when as a matter of fact his entire defense was that he shot at Mayfield, and had no intention of shooting Moon, who was in the rear of Mayfield, who was a larger man than Moon, and, as movant contends, drew a pistol on defendant before the shooting began; and this charge should have been made to apply to Mayfield rather than to the deceased.

6th. That the court erred in charging the jury as follows: "Now if you find that an arrest was made in this case, and the arrest was illegal, the defendant could have resisted the unlawful arrest by the use of all necessary force, or have avoided the attempted arrest by running away from the officer. If an officer is attempting to make a legal arrest and is using no more force than is necessary to effectuate the arrest, to kill him in resisting the arrest, solely to escape his arrest, is murder. If an officer is attempting to make an

illegal arrest, and it is not necessary to kill him in order to resist the arrest, to kill him merely to avoid arrest is manslaughter. If an officer is attempting an illegal arrest and is using such force as can not be resisted except by killing him, such killing would be justifiable homicide. A citizen whom it is attempted unlawfully to arrest has a right to resist force with force proportionate to that being used to arrest him; and if, in the exercise of such right of resistance, he kills an officer who is unlawfully attempting to arrest him, he is guilty of no offense. A person can use necessary force in resisting illegal arrest, which must be proportionate to that used by the arresting officer; but no person can justifiably kill another merely because such person is undertaking to illegally arrest the slayer. If, however, a person kill another to avoid an illegal arrest, and not in a spirit of revenge, the homicide is generally manslaughter, and not murder. If in the progress of the arrest the officer manifestly intends or endeavors by violence or surprise to take the life of or commit a felony on the person sought to be arrested, the latter would be fully justified in killing the officer or other person thus attempting his illegal arrest. If the circumstances surrounding the person at the time his illegal arrest is attempted are such as to excite the fears of a reasonable man that his life is in danger, or that a felony is about to be committed upon his person, and if, under the influence of such fears and not in a spirit of revenge, he slays the officer or other person attempting to illegally arrest him, he would be fully justified. If he were put in fear of a lesser injury than that of a felony, the homicide would be manslaughter." Movant contends that the above charge was error and prejudicial, for the reasons: (1) That said charge begins with the statement that "the defendant could have resisted the unlawful arrest by the use of all necessary force, or have avoided the attempted arrest by running away from the officer," thus placing upon the defendant the necessity of running away from the officer to avoid an illegal arrest. (2) That it refers to a legal arrest, when as a matter of fact the entire record shows that the arrest was illegal, and the court should have so charged the jury upon the trial. (3) That the court should have charged in connection therewith the contention of the defendant that he shot at Mayfield, and had no inintention of shooting the deceased. (4) That said charge entirely ignored the contention of defendant that Moon was in no way con-

nected with the assault upon him, but that Mayfield was the ag-
gressor, drawing his pistol on him, and that he shot at Mayfield
alone, and that Moon was wounded as a bystander, and that he had
no intention of shooting Moon, the deceased.

7th.  That the court erred in charging the jury as follows: "Now
I have been requested to call your attention, and do call your at-
tention, and charge you that if the defendant in this case was hav-
ing an altercation with or was shooting at Mayfield and the bullets
hit Moon, the same law would apply as if Mayfield had been shot.
If Mayfield had died, if that was the truth of the case, you would
apply the same law and the same rules of law I have given you,
just the same as if Mayfield had died.  If the defendant was in fact
shooting at Mayfield, whether or not he was shooting at Mayfield
or Moon, of course, is a matter for you to decide."  Movant con-
tends, his entire defense being based upon the fact that his arrest
was illegal, that Mayfield had drawn his pistol on him while sur-
rounded by his children, and there being evidence of all four shots
having struck Mayfield, his clothes showing a bullet hole through
the pants, and two through his coat, and wounds in right and left
hands, and only four shots being fired by defendant, that to delay
giving this contention in charge until the jury was ready to retire,
and then to state that upon request he would charge this principle,
and in the language used, movant contends was error, said charge
not fully stating the law applicable to this defense.

8th.  That the court erred in failing to charge the jury that under
proved facts the arrest of the defendant by the officers was illegal,
and that under the undisputed facts of the case the defendant had
the right to resist the arrest and to use such force as was necessary,
or as appeared to him as a reasonably courageous man to be neces-
sary.

9th.  That the court erred in his ruling that the relatives of May-
field were competent to serve upon the jury in the trial of the de-
fendant in this case, defendant's counsel having made the following
objections thereto: "There are four bills—another bill in the May-
field case, and I think anybody related to Mr. Mayfield would also
be disqualified.  I think Mr. Mayfield's relatives should be elim-
inated from the jury."

10th.  That the court erred in asking a leading question of the
witness Mayfield, and in thus suggesting to the jury a theory not

mentioned in the case, as follows: Q. Were you shot in both hands? A. Yes, sir. Q. With one shot? A. I could not tell whether it was one. The assignment of error is that this question amounted to a suggestion to the jury that the court was of the opinion that the two wounds in the right and left hands were made at one shot, and that this was error and harmful to the defendant, and amounted to an expression of opinion upon the part of the court.

The court overruled the motion, and the defendant excepted.

*Orrin Roberts,* for plaintiff in error.

*George M. Napier, attorney-general, Henry H. West, solicitor-general, T. R. Gress, assistant attorney-general,* and *E. W. Roberts,* contra.

HINES, J. (After stating the foregoing facts.)

1. The admission of the statement of the deceased to the witness Williamson, as a dying declaration, was not erroneous over the objection that the preliminary proof did not show that the deceased was conscious of the fact that he was in a dying condition. The deceased was shot on Thursday night. This statement was made on Friday night. The deceased died at 1:30 a. m. on the following Wednesday. He was shot in the left leg, above the knee, and the long bone in his thigh was shattered. He was shot in the left arm, and the bone of that arm was shattered. The medical testimony was that he died as the result of these shots. On Tuesday before the deceased died the doctors discovered that blood-poisoning had set in. In his statement to Williamson the deceased stated that he felt he would not recover, and that if anything happened he wanted to give to Williamson, who was the chief of police, an account of the manner in which he was shot by the defendant. From this statement the jury might infer that the deceased was conscious of his condition. There was evidence which would authorize a finding that he was not then in a dying condition, and there is no other express evidence, except the above declaration to the chief of police, that he was conscious of his condition and that he would not recover. To render statements of the deceased admissible as dying declarations, they must be made by him while in the article of death, and he must be conscious of his condition. Penal Code, § 1026. A prima facie case is all that is necessary to carry dying declarations to the jury. *Varnedoe* v. *State,* 75 *Ga.* 181 (58 Am. R. 465). In *Bryant* v. *State,* 80 *Ga.* 272 (4 S. E. 853), it was held that where

a person on Monday was lodged in jail under a charge of burglary, and showed signs of having been beaten, and died from the effects of the wound on Wednesday of the following week, and where on Friday after his incarceration he stated that he was going to die, and that a clan of men had whipped him with a buggy-trace, defendant being one of the crowd, there was no error in admitting these statements as dying declarations, although the witness who narrated them testified that he thought the deceased was in no particular danger when he made the statements, and although a doctor, who was sent for on Monday before he died, testified that he thought he would have recovered under proper treatment. Consciousness of his condition may be inferred from the nature of the wound, or from other circumstances. *Perdue* v. *State,* 135 *Ga.* 277 (69 S. E. 184) ; *Barnett* v. *State,* 136 *Ga.* 65 (70 S. E. 868) ; *Jefferson* v. *State,* 137 *Ga.* 382 (73 S. E. 499). An alleged dying declaration should not be rejected merely because such statement was made several days prior to the death of the declarant. *Coart* v. *State,* 156 *Ga.* 536 (3) (119 S. E. 723). The court properly submitted to the jury the final determination of the question whether the deceased, when this declaration was made, was in the article of death and conscious of his condition. The evidence in this case made an issue of fact whether the deceased was in the article of death and was conscious of his condition at the time he made this statement to the chief of police, and was one to be passed upon by the jury. *Anderson* v. *State,* 122 *Ga.* 161 (50 S. E. 46) ; *Findley* v. *State,* 125 *Ga.* 579 (54 S. E. 106). In view of the fact that the deceased afterwards, when clearly shown to be in the article of death, made a similar statement to his attending physicians, we are less inclined to hold that this statement was inadmissible upon the ground of objection urged against its admission.

2. Defendant insists that the court erred in giving in charge to the jury the instruction complained of in the fifth ground of the motion for new trial. The exception to this charge is based upon the ground, not that it is an incorrect statement of the law, but that the entire defense insisted upon by the defendant was that he shot at Mayfield and had no intention of shooting the deceased, who was in the rear of Mayfield, the latter being a larger man than the deceased, and who drew a pistol on the defendant before the shooting began; and that for this reason this instruction should have

been made to apply to Mayfield rather than to the deceased. We think this ground of exception is without merit. If the theory of defense that the defendant was justified in shooting the deceased, for the reason that he was justified in shooting at Mayfield, and in so shooting unintentionally killed the deceased, was applicable in this case, then any principle of law applicable in determining whether the defendant was justified in shooting at Mayfield would likewise be applicable in determining whether he was justified in killing the deceased. For this reason this instruction of the court to the jury was not erroneous solely for the reason that it was only applicable if the defendant had been on trial for the murder of Mayfield. The sole objection to this instruction being that it was inapplicable under the defense set up by the defendant, we are not called upon to determine whether this charge embodied a correct principle of law.

3. The defendant excepts to the charge embraced in the sixth ground as erroneous, (1) because of the language that the defendant could "have avoided the attempted arrest by running away from the officer;" (2) it refers to a legal arrest, when the arrest was illegal, and the court should have so charged the jury; and (3) the court should have charged in connection therewith the contention of the defendant that he shot at Mayfield, and had no intention of shooting the deceased. We are of the opinion that the court erred in the use of the language above quoted. A person who resists an illegal arrest is not required to flee from the arresting officer, if by flight he could avoid the illegal arrest. This error would require the grant of a new trial if the evidence disclosed that the defendant was guilty of no offense, or, if guilty of an offense, that the same was not committed in the presence of the officer, or the defendant was not endeavoring to escape, or for other reason there was not likely to be a failure of justice for want of an officer to issue a warrant. The undisputed evidence discloses that the defendant had committed an offense, and that this offense was committed in the presence of the arresting officer. Shortly before the arrest there had been a collision between an automobile of the defendant, the same being occupied by his wife and children and driven by himself, and an automobile driven by one Collins. A dispute arose between the defendant and Collins as to which one of them was at fault in causing the collision. The defendant insisted that

Collins was at fault, and this Collins denied. The collision having occurred within the limits of the City of Monroe, the defendant telephoned the deceased, who was a policeman of that city, to come to the scene of the wreck for the purpose of determining, while the evidence was fresh, whether the defendant or Collins was at fault in bringing about the collision. The deceased and Mayfield, another policeman of the city, soon appeared at the scene of the collision. The deceased informed defendant that he could not determine who was at fault and who was liable for damages, but that he would make a case against both of them for reckless driving, and the matter could be settled before the mayor the next day. He thereupon notified the defendant and Collins to appear before the mayor the next day at a given hour, and also notified certain other persons to appear before the mayor at the same time, personally as witnesses. The defendant, being enraged and excited, "ripped out cursing" Collins, and used of and to and in the presence of Collins, and in the presence of these officers, certain extremely abusive and offensive language. This language in abbreviated form appears in the statement of facts. Thereupon the deceased put the defendant under arrest, and placed him in charge of policeman Mayfield, the arrest being made for disorderly conduct, based upon the fact that the defendant was drunk and cursing. While there was evidence which would authorize the jury to find that the defendant was not drunk, and even that his appearance indicated that he was not drinking, there is no evidence which would authorize a finding that the defendant did not use to Collins the abusive and offensive language attributed to him by the policeman Mayfield. In his statement to the jury the defendant virtually admits the use of such language. According to the evidence for the State, this cursing and abuse of Collins by this defendant took place across the street from the filling-station. In his statement to the jury the defendant used this language: "We were standing over there talking, and this fellow Collins . . came over there and he commenced disputing my word, and of course it flew all over me, and I will admit I said things I was sorry of in a second. Mr. Moon said I ought to be ashamed. I was ashamed of what I said." It is true that other witnesses, who were across the street at the filling-station, testified they did not hear this cursing and abusive language, that they did not· hear any disturbance between the defendant and the police-

men, and that there was no arrest of the defendant by the deceased, so far as they knew. But in view of the evidence and of the above admission of the defendant, we think a finding that the defendant cursed and abused Collins in the presence of the officers was demanded.

Did the cursing of Collins by the defendant and the use by the latter to the former of extremely abusive and offensive language constitute an offense, either at comman-law, by our Penal Code, or the charter of the City of Monroe? In other words, did such cursing and use of this abusive and offensive language constitute a breach of the peace? By the common law, "The term 'breach of the peace' is generic, and includes all violations of the public peace or order, or decorum." "Breach of the peace is a common-law offense." 9 C. J. 386, § 1, A. It is true abusive and insulting language do not constitute a breach of the peace where there is no incitement to immediate violence. Where it has a tendency to create a tumult and provoke a conflict, and especially where denounced by statute, the use of such language may constitute an offense. 9 C. J. 388, § 3, 2. In the instant case the cursing and abuse which the defendant heaped upon Collins was calculated to produce immediate violence, and constituted a breach of the peace. While the defendant could not have been arrested for the use of the abusive language, he could be arrested for breach of the peace. By express provision of our Penal Code, § 366, all offenses against the public peace, not therein provided for, are misdemeanors. This section is sufficiently broad in its terms to authorize the punishment of any offense which was an offense at the common law against the public peace, and punishment of which is not provided for in our Penal Code. *Ormond* v. *Ball,* 120 *Ga.* 916 (48 S. E. 383) ; *Prichard* v. *State,* 160 *Ga.* 527 (128 S. E. 655). The defendant being engaged in a breach of the peace, or in an attempt to commit a breach of the peace, and the same being committed within the limits of the City of Monroe and in the presence of its policemen, these officers had the right to arrest him. By the common-law, an officer could arrest without a warrant in cases of breaches of the peace committed in his presence. Hawley's Criminal Law, 98. By our law they can do the same thing. *Smith* v. *State,* 10 *Ga. App.* 36 (72 S. E. 527). In this State, "An arrest may be made for a crime by an officer . . without a warrant, if the offense is committed in his presence, or

the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." Penal Code, § 917. This provision of law "is applicable alike to State and municipal arresting officers." *Porter* v. *State,* 124 *Ga.* 297 (52 S. E. 283, 2 L. R. A. (N. S.) 730). A policeman is as much under the protection of the law in making an arrest as any public officer, such as sheriff, bailiff, or constable. *Johnson* v. *State,* 30 *Ga.* 426. A police officer may make an arrest without a warrant, for a crime committed in his presence; but there must be an offense committed by the party arrested. *O'Connor* v. *State,* 64 *Ga.* 125 (37 Am. R. 58). "A charge that a policeman may arrest without warrant, for disorderly conduct or other violation of city ordinances, or for crime, in order to prevent escape, is not error." *Harrell* v. *State,* 75 *Ga.* 842 (2). In *Daniel* v. *Athens,* 110 *Ga.* 289 (34 S. E. 1020), it was held that "The use, in the presence of a man, of an obscene word in an ordinary tone, without anger, and under circumstances not calculated to offend the hearer or cause a breach of the peace, does not constitute a violation of a municipal ordinance prohibiting disorderly conduct 'calculated to disturb the peace of the citizen.'" But the converse of the proposition, that the use of abusive language, calculated to cause a breach of the peace, violated such ordinance, necessarily follows under this ruling. By the 32d section of the charter of the City of Monroe, any policeman of said city can arrest without a warrant any person he may see violating any of its ordinances, or any person reported to him as having violated said ordinances. Acts 1896, pp. 212, 221. Having reached the conclusion that, under the law and facts of this case, a finding was demanded that the arrest of the defendant was legal, any errors embraced in the charge of the court in his instruction to the jury, touching the right of the defendant to resist an illegal arrest, do not require the grant of a new trial. *Georgia etc. R. Co.* v. *Lasseter,* 122 *Ga.* 679 (50 S. E. 105).

4. The charge complained of in the seventh ground does not require the grant of a new trial. Neither the evidence nor the statement of the defendant made a case of justifiable homicide, under the theory that the defendant was justifiable in shooting at Mayfield and unintentionally killing the deceased. The evidence shows that the defendant shot twice at Mayfield, and twice at the deceased. In his statement the defendant does not assert that he

was shooting at Mayfield and accidentally shot the deceased. He asserts that he did not know the deceased was hit; but he makes the same statement as to Mayfield. Furthermore, in the circumstances, if the defendant wished any further instruction upon this theory of defense, he should have preferred a request for such additional instruction.

5. Under what we have said in the third division of this opinion, the court did not err in failing to charge the jury that, under the proved facts, the arrest of the defendant by these officers was illegal. On the contrary, such instruction would have been erroneous.

6. Where a defendant was indicted and tried for the murder of a policeman, and was separately indicted for an assault with intent to murder another policeman, both offenses growing out of the same transaction, the ruling of the trial judge that the relatives of the latter policeman were competent jurors to try the defendant in the murder case, even if erroneous (on which we do not pass judgment), does not require the grant of a new trial, as it was not shown that the defendant was in any way injured thereby, it not being made to appear that any relative of Mayfield served on the jury, or that the defendant was compelled to exhaust his peremptory challenges for the purpose of getting rid of such relatives, and that for this reason he could not challenge other jurors whom he wished to get rid of, or that the State was in any way benefited by such ruling. The burden was upon the defendant to show that he was in some way injured by this ruling. This he has failed to do. *Etheridge* v. *State,* 163 *Ga.* 186 (1(*b*)) (136 S. E. 72) ; *Ford* v. *State,* 12 *Ga. App.* 228 (76 S. E. 1079) ; 16 R. C. L. 291, § 106.

7. The assignment of error in the tenth ground is without merit.

8. The evidence authorized the verdict.

*Judgment affirmed. All the Justices concur, except Atkinson, J., who dissents from third and sixth headnotes.*